799 F.2d 1523
 6 Fed.R.Serv.3d 64
 TERRY PROPERTIES, INC., a Corp.; Hillcrest Corp., a Corp.;
Roy Terry, an Ind.; & Rudolph Terry, an Ind.,
Plaintiffs-Appellants, Cross-Appellees,
v.
STANDARD OIL CO. (IND); Amoco Chemicals Corp.; the City of
Roanoke, Al.; the City Council of the City of Roanoke, Al.;
Henry V. Bonner, Mayor of the City of Roanoke, Al., as
Mayor and Ind.; Tommy Hill, former Mayor of Roanoke, Al.,
as Mayor and Ind.; William E. Montgomery, as Chairman of
the Utility Board and Ind.; James Lane, as Chairman of the
Industrial Development Board of Roanoke, Al. and Ind.; Roy
Reeves, Ind.; Earl Mannings, Ind.; Joe B. Turner, Ind.;
Olin Sheppard, Ind. and as Clerk of the City of Roanoke,
Al.; & Stell Benefield, Ind., Defendants-Appellees,
Amoco Fabrics Co. and the Industrial Development Board of
the City of Roanoke, Al., Defendants-Appellees,
Cross-Appellants.
 No. 85-7014.
 United States Court of Appeals, Eleventh Circuit.
 Sept. 24, 1986.
 
 Chester D. Davenport, Davenport & Seay, Makila James, Harold E. Jordan, Tomas R. Lopez, Washington, D.C. for plaintiffs-appellants, cross-appellees.
 Grover Hankins, Nat. Ass'n for the Advancement of Colored People, Brooklyn, N.Y., Timothy Brown, Brown & Vance, Frederick A. Douglas, Leftwich, Moore & Douglas, Washington, D.C., for amici curiae MBELDEF & NAACP.
 Julius LeVonne Chambers, Charles Stephen Ralston, New York City, for NAACP Legal Defense & Educ. Fund.
 Edward S. Allen, Balch, Bingham, Baker, Ward, Smith, Bowman & Thagard, John P. Scott, Jr., Birmingham, Ala., Theresa J. Arnold, Chicago, Ill., for Standard Oil, Amoco Chemicals & Amoco Fabrics.
 John Denson, Samford, Denson, Horsley, Pettey, Martin & Barrett, Opelika, Ala., for City of Roanoke, et al.
 William O. Miller, G. Stephen Parker, Robert B. Baker, Jr., Atlanta, Ga., for Southeastern Legal Foundation.
 Robin S. Conrad, Paula J. Connelly, Lynn M. Smelkinson, Washington, D.C., for the Chamber of Commerce of the U.S.
 Appeals from the United States District Court for the Middle District of Alabama.
 Before RONEY, Chief Judge, CLARK, Circuit Judge, and DOYLE*, Senior District Judge.
 CLARK, Circuit Judge:
 
 
 1
 Appellants appeal from the district court's determination that they failed to prove their claims of race discrimination arising from the location of an industrial plant adjacent to their property and consequent rerouting of a road. They also appeal from the assessment of certain attorney's fees and costs against them. Cross-appellants appeal from the district court's determination that they failed to prove the counterclaim of intentional interference with their business relationships. We affirm the district court's findings with respect to liability on both the appeal and cross-appeal and affirm the assessment of costs against appellants. We also affirm the decision to award attorney's fees in favor of appellee Tommy Hill, but reverse the award of attorney's fees in favor of the other appellees.
 
 I. FACTS
 A. Background of Appeal
 
 2
 The appellants in this case are Rudolph and Roy Terry and two of their businesses, Terry Properties, Inc., and Hillcrest Corporation. Rudolph and Roy Terry, brothers, are prominent black businesspeople engaged in manufacturing and real estate development in Roanoke, Alabama. Terry Properties, Inc. and Hillcrest Corporation were formed in 1973 to develop certain real property into a residential community known as Hillcrest Community. Rudolph and Roy Terry also own and operate Terry Manufacturing Company, an apparel plant located in Roanoke, which is a cross-appellee in this action. We will refer to Rudolph and Roy Terry and their businesses as "the Terrys" throughout this opinion.
 
 
 3
 Roanoke is a city of approximately 6,000 people located in Randolph County in eastern Alabama. The individual appellees associated with Roanoke are Henry Bonner, Mayor of Roanoke since June, 1979 and previously Mayor Pro Tem and City Council member, Olin Sheppard, City Clerk and Secretary-Treasurer for the Industrial Development Board ("IDB") and for the Utilities Board ("UB"), Tommy Hill, former Mayor of Roanoke, William E. Montgomery, Chairman of the UB, James Lane, chairman of the IDB, Stell Benefield, Randolph County Probate Court judge, and Roy Reeves, Earl Manning and Joe Turner, all members of the Randolph County Development Association ("RCDA"), a voluntary association organized to encourage industry to locate in the Roanoke area. The Roanoke appellees also include the City of Roanoke, the Industrial Development Board and the Utilities Board. We will refer to the appellees associated with the City of Roanoke as "the City appellees" throughout this opinion.
 
 
 4
 The corporate appellees are Amoco Fabrics Company ("Amoco Fabrics"), which operates a carpet backing manufacturing plant in Roanoke known as Roanoke Mills, Amoco Chemicals Corporation ("Amoco Chemicals"), parent corporation of Amoco Fabrics, and Standard Oil Company of Indiana ("Standard Oil"), parent corporation of Amoco Chemicals. We will refer to these appellees as "the corporate appellees" throughout this opinion.
 
 
 5
 In 1973, Rudolph and Roy Terry purchased some land adjacent to property owned by Roanoke Guano Company for residential development. The property was located south of a pulpwood factory and a railroad, northwest of the Candlewick Yarns plant, east of a cattle sales barn and a slaughterhouse and north of the airport. To the east lay the Roanoke Guano Company property and the center of Roanoke. A dirt road running east-west provided access from the property purchased by the Terrys past the Roanoke Guano Company property to the city center.
 
 
 6
 In 1974, the Terrys began construction of their residential development. The City, at the Terrys' request, paved the dirt road running past the Roanoke Guano Company property and named it Industrial Boulevard. As of 1979, the Terrys had constructed thirty single-family homes and six apartment buildings designed to meet the need of the black community for modestly priced housing. This development came to be known as Hillcrest Community.
 
 
 7
 During the 1970's, the unemployment rate in Roanoke climbed steadily. Early in the decade, the closing of a textile plant resulted in the loss of 850 jobs. Alarmed by the worsening state of the local economy, Roanoke citizens began to organize to encourage industry to locate in Roanoke and in Randolph County. In 1978, the Randolph County Development Association ("RCDA") was formed in a volunteer effort to attract industry. Rudolph Terry was a member of the board of directors of RCDA. In early 1979, the Roanoke Chamber of Commerce sought to secure certification of Roanoke as a "Preferred City" through an Alabama Development Office ("ADO") program designed to prepare communities to compete for industry. Appellees Reeves, Manning, Turner and Lane participated in the RCDA and in the Preferred Cities Program. They, along with Bonner and Sheppard, were volunteers trained by the Preferred Cities Program, the ADO, Alabama Power Company and Seaboard Railroad in the strategies of successfully recruiting new industry. According to the City, this training was available to any interested member of the public. The Terrys, although Rudolph was a RCDA board member and Roy was on the Industrial Development Committee of the Chamber of Commerce, chose not to participate in the training. Roanoke eventually became the third Alabama city to be accorded Preferred City status.
 
 
 8
 In 1978, the City purchased 80 acres of land adjacent to the Hillcrest Community from the Roanoke Guano Company. With this addition, the City owned an 148 acre parcel of land to the east of Hillcrest Community, 80 acres of which lay north of Industrial Boulevard. Title opinions obtained at the time certified that the property was zoned for industrial use, and the tract was named Industrial Park. Industrial Park was one of several sites identified by the City as suited for use by potential new industry. It was advertised as such in a brochure published and circulated by the RCDA. Other sites identified for possible industrial use included the Phillips property (30-35 acres), the Robinson property (55 acres) and the Cummings property (80-100 acres).
 
 
 9
 As community members took steps to alleviate Roanoke's economic troubles, the City was experiencing other problems. During the summer of 1979, tension between blacks and whites heightened when charges of police brutality against blacks were made. Compounding the problem, Mayor Tommy Hill appointed a white man who had been convicted of assaulting a black minister as police chief and retroactively pardoned the new chief's prior conviction to avoid his disqualification. The Terrys took on active leadership roles during the period of racial unrest by organizing demonstrations and boycotts to protest the police brutality, appearing before the City Council and participating in efforts to increase black voter registration. It is in the light of the economic difficulties of the City and the racial tension during the latter half of 1979 that the particular facts leading to this lawsuit must be considered.
 
 
 10
 In June of 1979, Thomas F. Ryan of the Alabama Power Company met with T. Webster Williams of Amoco Fabrics to discuss the possible location of a synthetic carpet backing manufacturing plant in Alabama. Ryan suggested Roanoke and a number of other cities. Because the Roanoke labor force included workers with textile manufacturing skills, Williams indicated he would be interested in considering it if a site of approximately 80 to 125 acres could be located in the area. Williams asked that the name of the interested industry not be disclosed to the public under any circumstances.
 
 
 11
 Ryan contacted Reeves, with whom he had previously worked in connection with industry development, and told him about the interested industry and its requirements. A meeting was arranged to introduce Williams to Randolph County citizens who could provide information relevant to the choice of an industrial site. Williams, who at that time had participated in selecting sites for five Amoco Fabrics plants in Canada and the United States, typically gathered information about the majority and minority population of a community, major industrial employers, size of the labor force, availability of utilities, rail transportation, education and housing, and about the local tax structure.
 
 
 12
 Williams' (who called himself "Mr. Webb") first meeting with Roanoke area community members took place on about June 26, 1979, and included one black person, Charlie Whittone, who was a member of the Board of Education. Williams met with various Randolph County citizens on June 26 and 27. Thereafter, a small group of volunteers known as the Ad Hoc Committee was organized to work with Ryan to respond to Williams' requests. This group consisted only of white males, including Reeves, Manning, Turner, Bonner, Sheppard, Benefield, Lane and Montgomery. The Terrys were not invited to participate, according to the City appellees, because they had not previously volunteered to assist in actual industry recruitment. Williams did, however, meet with Roy Terry on July 10, 1979, during his second visit to Roanoke. At that time, Williams informed Roy Terry of the general nature of the proposed project and solicited information about the Roanoke labor force.
 
 
 13
 Two of the factors considered by Amoco Fabrics in selecting a city in which to locate its plant are particularly relevant to the issues on appeal. The first factor was Amoco Fabrics' desire that it build its plant in a city with a minority population no greater than 35% of the total population, allegedly because it had previously experienced difficulty meeting affirmative action goals in communities with proportionately larger minority populations. This requirement was communicated to Ryan in his initial meeting with Williams.
 
 
 14
 The second factor was Amoco Fabrics' request that the City conduct a labor survey in which white males were to be sampled most heavily. According to Williams, the purpose of such a survey is to determine the depth of a community's labor market by interviewing individuals to discover whether they will find employment with Amoco Fabrics desirable and whether Amoco Fabrics will find them employable. Williams theorized that, as white males experience the lowest unemployment, a labor shortage will be first reflected in the employment of white males. Williams denied that the survey methodology reflects anything about Amoco Fabrics' hiring practices, and Amoco Fabrics professes to have a policy of hiring minorities in relation to their proportion of the population in every job category, including management and supervisory personnel.[1]
 
 
 15
 In August, 1979, prior to recommending that Amoco Fabrics select Roanoke, Williams required and obtained from Mayor Pro Tem Bonner, on behalf of the Ad Hoc Committee, a letter confirming verbal commitments that had been made regarding land, water, natural gas, sewage and other matters. It does not appear that this group had the authority to make any such commitments, and Williams understood that appropriate proceedings, including City Council approval, would be required to carry out the promises.
 
 
 16
 The selection of a building site in Roanoke began on June 28, 1979, when Williams was shown several sites in and around Roanoke, including the Industrial Park, the Robinson property and the Cummings property. The Robinson property was eventually rejected because it was too small, efforts to purchase additional land being unsuccessful, and because a lake on the property made it undesirable from an engineering standpoint. The Cummings property was large enough but lacked utilities. The Industrial Park was finally selected for its size, available utilities and proximity to rail transportation and because the City already owned it. Williams testified that neither the City nor the Ad Hoc Committee recommended or encouraged selection of any one site over any other.
 
 
 17
 When Williams viewed Industrial Park, he informed Ryan and the City appellees that the road running through the property, Industrial Boulevard, would have to be closed. Mayor Pro Tem Bonner decided to reroute the road rather than close it, and city engineers planned a new route around Industrial Park, surveying it on October 18, 1979. The new route was to increase the distance between Hillcrest Community and other points in the City by a distance of seven-tenths of a mile.
 
 
 18
 The property owners whose land would have to be purchased or condemned to accomplish the rerouting, all of whom were white, were contacted to determine the availability of property for the project. According to the City appellees, those property owners needed to obtain a right-of-way were the only property owners to be contacted about the proposed rerouting prior to the public hearing on the matter. The Terrys, who would be affected by the rerouting but whose property would not have to be acquired, were not informed or consulted about the rerouting.
 
 
 19
 The Terrys were present at the City Council meeting held on October 22, 1979, when Manning presented a proposal for approval of the request to close and reroute Industrial Boulevard. The Terrys asked no questions about the proposal. It was announced at this meeting that the request would be considered at a later meeting, which the minutes reflect was set for October 30, 1979.
 
 
 20
 On October 23 and 24, 1979, the Terrys met with members of the Ad Hoc Committee to discuss the rerouting of Industrial Boulevard. The Terrys asked to meet with representatives of the still unidentified industry to propose alternatives to the rerouting planned by City engineers. As the Terrys' proposals would require that the road continue to run through Industrial Park, the committee members explained that the industry would not find them acceptable. They refused to arrange any meeting with industry representatives for fear of jeopardizing the industry's interest in Roanoke.
 
 
 21
 On October 30, 1979, the City Council met and approved the rerouting of Industrial Boulevard. Among those voting to approve the request was Councilman Pool, a black council member who seconded the motion. The time and date of the meeting were announced on a local radio station. Although the Terrys had written to the City Council on October 29 to protest the rerouting, they were not notified of this meeting and did not attend.
 
 
 22
 In November, 1979, Amoco Fabrics issued a check for $200,000 as a deposit to reimburse the City for the expense of rerouting the road should the plant not be built. Apparently, Amoco Fabrics provided the deposit when it was informed that community members were concerned about spending public money on relocating the road without having received an assurance that the industry would locate at the Industrial Park. At the time the deposit was made, Williams and Earl Honeycutt, the president of Amoco Fabrics, were not aware of the Terrys' objections to the road closing and rerouting.
 
 
 23
 In November, 1979, the Ad Hoc Committee issued a news release accusing the Terrys of "muddy[ing] the water up" by opposing the road closing. In December, 1979, the Terrys responded with a press release protesting the rerouting of Industrial Boulevard. In the release, they also stated the following:
 
 
 24
 We at HILLCREST are especially happy because the industry has chosen the area that we have tried to develop into a very nice place in which to live and work. In fact, when HILLCREST was first proposed many years ago and located on a little dirt trail which was later to become Industrial Boulevard, it was our dream and the dream of then-Mayor Phillips and his administration that an attractive housing development and a paved street connecting Chestnut Street and Old 431 would help to attract industry to the Industrial Park.
 
 
 25
 That month the Terrys also alleged, through publicized statements issued by the Concerned Citizens group, of which the Terrys were spokespersons, that the rerouting of the road was racially discriminatory.
 
 
 26
 In February, 1980, when the rerouted portion of Industrial Boulevard had been constructed, the City filed a declaration for the vacation of the old portion of Industrial Boulevard. The City publicized the fact that it intended to close the old road on February 15, 1980. The Terrys filed an action in the Circuit Court of Randolph County to enjoin the road closing. A hearing on the injunction was set for February 15. On February 14, Mayor Pro Tem Bonner directed Probate Judge Stell Benefield to send the equipment to begin plowing the road at 6:30 a.m. on the 15th. In his capacity as Chief Executive Office of Randolph County, Judge Benefield ordered the equipment sent as directed. The preliminary injunction was not granted after the hearing on the 15th.
 
 
 27
 A trial on the merits was held on February 22, 1980, before Circuit Judge James A. Avary, who refused to order the injunction. By that time, the road had already been plowed up. The Terrys' appeal to the Alabama Supreme Court was eventually dismissed as moot on the ground that the Terrys were afforded all available relief through probate and circuit court proceedings on the propriety of the road closing and damages therefrom (to be described below). Terry Properties v. City of Roanoke, 401 So.2d 25, 26 (Ala.1981).
 
 
 28
 On April 1, 1980, the City commenced proceedings in Randolph County Probate Court to close the road and to assess damages to property owners affected by the closing, including the Terrys, pursuant to Alabama Code Secs. 23-4-1 to 6. Judge Stell Benefield heard the City's petition. Following the hearing, Judge Benefield ordered the road closed. A panel of commissioners appointed to determine the compensation due affected landowners assessed the Terrys' damages at zero.
 
 
 29
 The Terrys (not including Rudolph) appealed this decision to the Circuit Court of Randolph County. After a de novo hearing, the judge determined that the closing was for the public benefit and had been accomplished according to state law. A jury was selected and returned a verdict of zero damages with respect to the Terrys. No appeal was taken from this verdict. However, as noted above, the Alabama Supreme Court dismissed the Terrys' appeal from the denial of injunctive relief, finding:
 
 
 30
 Appellants have been given an opportunity to voice their objections to the partial vacation of Industrial Boulevard. Both a panel of commissioners and a jury have passed upon the issue of damages which may have been suffered by appellants and others as a consequence of the vacation of the street. The City has complied with the provisions of Code 1975, Sec. 23-4-1, et seq. Any relief this Court might grant appellants has already been afforded in the probate and circuit courts.
 
 
 31
 Terry Properties, Inc., 401 So.2d at 26. At the time of the various proceedings in the state courts, the Terrys were unaware that the same judge who presided over the probate court hearing on the road closing had ordered the road plowed up in the early morning hours prior to the February 15 hearing on preliminary injunctive relief.
 
 
 32
 On December 6, 1979, the Chairman of the IDB signed a construction contract to commence work on an Amoco Fabrics training building without having received prior authorization from the IDB. On January 28, 1980, at its regular meeting, the City Council adopted a resolution authorizing the transfer of a portion of Industrial Park to the IDB for the purpose of issuing bonds to finance the first phase of the as-yet unidentified industry's development, the training building. The resolution stated that the industry's facilities would be constructed on land sold or leased by the IDB and would require that the City transfer title to the IDB. The Terrys attended this meeting.
 
 
 33
 The City conveyed the deed to 5.5 acres of Industrial Park to the IDB on February 13, 1980. The IDB held several meetings in January and February to authorize the sale and bond financing. These meetings were not publicized but were open to the public. The minutes of the meetings reflect that they were held to take action necessary to accomplish bond financing for the training building. Construction of the building began in February, 1980.
 
 
 34
 On February 27, 1980, following Standard Oil's approval of the capital expenditure for the plant, Amoco Fabrics publicly announced its decision to begin construction of Roanoke Mills. The president of Amoco Fabrics made the decision to locate the plant in Roanoke. Amoco Chemical and Standard Oil did not participate in or approve site selection but did approve the expenditure of sixty million dollars for construction of Amoco Fabrics' fourth United States plant.
 
 
 35
 Upon learning the identity of the new industry, the Terrys contacted Standard Oil to complain about the plant location, the road closing and the higher wage scale Amoco Fabrics would be offering local employees. Amoco Fabrics was notified of the complaints and requested the City to advise it of the procedures used to close and reroute Industrial Boulevard.
 
 
 36
 Construction of Roanoke Mills began in February, 1980, and the plant was operating as of September, 1980. An Amoco Fabrics engineer responsible for the plant layout on the site testified that the City appellees had nothing to do with the choice of layout. He further testified that the plant was not placed to harm the Terrys and explained the factors that went into his decision.
 
 
 37
 In late 1980, Rudolph Terry searched through City zoning records to investigate the zoning of Industrial Park and of the Terry Manufacturing Plant property. He discovered that a portion of the property on which his plant was located was actually zoned for residential use. The Terrys petitioned the City Council to rezone this property to an industrial classification. The petition was granted without opposition on December 8, 1980.
 
 
 38
 Rudolph Terry also discovered that thirty-seven acres of Industrial Park was zoned for residential use. The Terrys filed a diversity suit in federal district court on December 12, 1980, alleging, inter alia, that the corporate appellees were in violation of City zoning laws. The complaint served as the City's first notification that there was a zoning problem with Roanoke Mills. As noted above, it had received a title opinion in 1978 concluding that Industrial Park was zoned for industrial use. On June 4, 1981, the Planning Commission approved a resolution recommending rezoning to industrial use, with member Rudolph Terry voting against the recommendation. On June 22, 1981, the City Council approved the rezoning. As was the policy and practice in Roanoke, the Council did not require that a buffer zone be established between this property and the Hillcrest Community. No buffer zone was required to be established between Terry Manufacturing Company's plant and neighboring residential areas.
 
 
 39
 The Terrys investigated what they perceived as further irregularities in the construction and operation of Roanoke Mills. No building permit was issued with respect to the plant. The record reveals, however, that Roanoke had no building inspector and did not issue such permits. No building permit was ever issued to Terry Manufacturing Company. The Terrys also learned that Amoco Fabrics did not receive a State Indirect Discharge Permit authorizing discharges into the sewer until June 22, 1981, approximately nine months after Roanoke Mills began operating.[2] The City Council did not vote to sell the bulk of Industrial Park to the IDB until April 27, 1981. At that time, Mayor (former Mayor Pro Tem) Bonner represented that such a sale was necessary to honor "commitments of the prior administration" to Amoco Fabrics. The Terrys, who attended all City Council meetings between June 22, 1979 and April 27, 1981 (except the October 30, 1979 meeting), deny that any such commitments were ever discussed or that the Council ever authorized the construction and operation of Roanoke Mills on City owned property before April 27, 1981. Finally, the Terrys claim that the City Clerk refused to turn over relevant documents, particularly minutes of 1980 IDB meetings, as requested. The Terrys' difficulty persuading the City to cooperate in their search for irregularities in the construction of Roanoke Mills culminated in Mayor Bonner's June 8, 1981 order that the clerk was not to release any more documents to the Terrys without a court order. (The City and the Terrys were at that time embroiled in the litigation commenced in December, 1980).
 
 B. Background on Cross-Appeal
 
 40
 On May 6, 1981, with the Terrys in attendance, the IDB voted to authorize the issuance of industrial development bonds to finance construction of Roanoke Mills. Standard Oil had guaranteed the bonds, which were to be repaid from rental revenue paid IDB by Amoco Fabrics.
 
 
 41
 At the May 6 meeting, the Terrys learned that the California State Teachers' Retirement System ("STRS") and the California Public Employees' Retirement System ("PERS") were to purchase the IDB bonds. The bond sale was scheduled to close on May 20, 1981. Rudolph Terry contacted the two retirement systems and met with their representatives in California on May 12, 1981. Rudolph Terry informed the systems that he wanted to make sure that they were aware of his concerns about the road closure, zoning, waste water discharge permits and a lawsuit pending against the corporate appellees. As a result of the concerns expressed on behalf of the Terrys at this meeting and in many phone calls to the systems' representatives, the bond sale was postponed until June 25, 1981. The delay resulted from the systems' desire to receive assurances that the problems alleged by the Terrys would not lead to nuisance suits against the retirement systems.
 
 C. Procedural History
 
 42
 On December 12, 1980, Terry Properties, Inc. and Hillcrest Corporation filed a complaint in the United States District Court for the Northern District of Alabama against Amoco Fabrics, Amoco Chemicals and Standard Oil, invoking diversity jurisdiction. This initial complaint alleged violation of the City's zoning laws, operation of a nuisance and trespass arising out of the construction and operation of Roanoke Mills. The action was transferred to the Middle District of Alabama on January 23, 1981.
 
 
 43
 On June 22, 1981, the complaint was amended to add Roy and Rudolph Terry as plaintiffs and the City appellees as defendants. The amended complaint alleged violations of the Thirteenth and Fourteenth Amendments and 42 U.S.C. Secs. 1982, 1983, 1985(3), 1988 and 2000d in the form of racial discrimination, deprivation of property without procedural and substantive due process, taking without just compensation, retribution for the exercise of protected speech and conspiracy to deprive the Terrys of their constitutional rights. The complaint also contained counts alleging nuisance, violation of state law in the transfer of Industrial Park from the City to the IDB, violation of the Alabama and Federal Pollution Control Acts, and violation of the Resource Conservation and Recovery Act and the Alabama Hazardous Wastes Management Act in failing to obtain permits for disposal of hazardous waste. The Terrys prayed for injunctive and declaratory relief and for damages both compensatory and punitive in nature. The IDB and Amoco Fabrics filed counterclaims against the Terrys, including Terry Construction Company and Terry Manufacturing Company, for intentional and malicious interference with the counterclaim plaintiffs' relationship with the purchasers of the bonds issued by IDB to finance construction of Roanoke Mills.
 
 
 44
 In various orders, the district court disposed of many of the Terrys' claims through summary judgment. On November 4, 1981, the district court granted summary judgment in favor of the defendants on the claims under 42 U.S.C. Secs. 1988 and 2000d and under the various federal and Alabama statutes regulating matters affecting the environment. On June 23, 1982, the district court granted summary judgment in favor of the defendants with respect to the validity of the transfer of property from the City to the IDB under state law and with respect to all claims for damages arising from the closing and rerouting of Industrial Boulevard. The court held that Roy Terry, Terry Properties, Inc. and Hillcrest Corporation were collaterally estopped from arguing they had been injured by the road closing and rerouting by the jury's assessment of zero damages in the Circuit Court of Randolph County. The court later determined, on November 19, 1982, that Rudolph Terry was similarly collaterally estopped by virtue of the commissioners' assessment of zero damages in the probate court proceedings and his failure to appeal therefrom. Finally, on December 2, 1982, the district court granted summary judgment in favor of Bonner, Hill, Montgomery, Lane and Sheppard in their official capacities, holding they were absolutely immune from suit as public officials.
 
 
 45
 Trial on the remaining issues commenced on February 7, 1983, and continued for approximately four weeks. At the conclusion of the Terrys' evidence on liability, the district court granted a Fed.R.Civ.P. 41(b) motion to dismiss filed by Standard Oil and Amoco Chemicals. The court declined to hear evidence as to damages on any of the Terrys' claims or on the counterclaims. On January 20, 1984, the district court issued a memorandum opinion and judgment denying the relief sought in the amended complaint and in the counterclaims. The court assessed costs against the Terrys.
 
 
 46
 With respect to the Terrys' 42 U.S.C. Sec. 1982, Thirteenth Amendment and equal protection claims, the court found that the defendants had not acted with discriminatory intent and that the plant would have been built at Industrial Park regardless of any wrongful acts or omissions by any defendant. The court also found that no property interest protected under Sec. 1982 had been infringed. With regard to the due process and taking claims, the court found that there had been no taking or deprivation of any property interest cognizable under the Constitution. The court held that the Terrys had not made out a case under 42 U.S.C. Sec. 1985(3) because they had not proven that the defendants agreed to commit illegal acts with the purpose of depriving the Terrys of equal protection or that they committed any acts in furtherance of the alleged conspiracy. The court also found that the meetings alleged by the Terrys to have been held in secret were held pursuant to Alabama law, which requires open meetings but does not require public notice of the time and date of meetings.
 
 
 47
 The court also held that all of the Terrys' race discrimination claims were barred by operation of the Alabama one-year statute of limitations that was then applicable in civil rights actions. The court reiterated that the Terrys were collaterally estopped from claiming they were damaged by the road closing and rerouting. Finally, it held that the City defendants were entitled to good faith immunity because they acted in the good faith belief that their actions violated no one's constitutional rights.
 
 
 48
 As for the remaining claims, the district court found that "no evidence whatsoever was introduced as to any [environmental law] violations." In a lengthy discussion of the nuisance claim, having visited the Roanoke Mills site and "stayed as long as any of the lawyers insisted the Court should stay to be sure that it observed the various factors," the court found that the plant did not materially interfere with the ordinary comfort of ordinary people and so was not a nuisance under Alabama law.
 
 
 49
 With regard to the counterclaims, the court found that the Terrys committed a series of acts that interfered with the bond sale, causing harm to the counterclaim plaintiffs. The court found, however, that the Terrys did not intend to interfere with the business and that, in any event, the Terrys had proved the affirmative defense of justification. The court concluded that the Terrys should prevail on the counterclaims.
 
 
 50
 On July 30, 1984, the district court entered an order determining that the Terrys' claims against Hill, the UD, the IDB, the City, Standard Oil and Amoco Chemicals were frivolous "from their inception" and awarding attorney's fees to those defendants under 42 U.S.C. Sec. 1988. On December 7, 1984, the court entered an order setting the attorney's fee award at $238,252.61. Notice of appeal and of cross-appeal from the various orders of the district court were timely filed.
 
 II. ISSUES
 
 51
 The Terrys raise the following issues on appeal: (1) whether Alabama's six-year statute of limitations applies to their civil rights action and, if not, whether application of the continuing violation theory leads to the conclusion that the district court erred in holding that their civil rights claims are time-barred by the one-year statute of limitations; (2) whether the district court's finding that the City and corporate appellees did not have the requisite intent to discriminate was clearly erroneous, and whether the court applied the correct legal standard in making its finding; (3) whether the district court erred in applying collateral estoppel principles to exclude evidence on the road closing and rerouting; (4) whether the district court erred in finding that the Terrys did not prove conspiracy and retaliation within the meaning of 42 U.S.C. Sec. 1985(3); (5) whether the district court erred in awarding attorney's fees to certain of the defendants; (6) whether the district court abused its discretion in ordering the Terrys to pay certain costs of the defendants. The issue on cross-appeal is whether the district court erred in finding no intentional interference with the cross-appellant's business relations and in finding justification for any intentional interference.
 
 
 52
 Because the district court heard evidence on and decided all of the Terrys' civil rights claims on the merits, and because we have no doubt that the district court's findings with respect to the merits are not clearly erroneous, we do not address the statute of limitations questions but affirm the judgment on the merits. We also affirm the decision to award costs against the Terrys. However, we reverse the award of attorney's fees to the defendants except to the extent fees were awarded in favor of Tommy Hill.
 
 III. ANALYSIS
 A. Discriminatory Intent
 
 53
 The Terrys' complaint raised substantive civil rights claims under the Thirteenth Amendment, the equal protection clause of the Fourteenth Amendment and 42 U.S.C. Sec. 1982.[3] The corporate appellees, as private actors, may be liable for infringement of Fourteenth Amendment rights only through conspiracy with state actors in violation of 42 U.S.C. Sec. 1985(3). They may be liable directly under 42 U.S.C. Sec. 1982 as that statute applies to private parties and does not require state action. Jones v. Alfred H. Mayer Co., 392 U.S. 409, 413, 88 S.Ct. 2186, 2189, 20 L.Ed.2d 1189 (1968). They may also be liable directly under the Thirteenth Amendment as it absolutely prohibits the practice of slavery. See City of Memphis v. Greene, 451 U.S. 100, 120, 101 S.Ct. 1584, 1596, 67 L.Ed.2d 769 (1981).
 
 
 54
 With regard to the equal protection claim, the district court found that the defendants had not acted with discriminatory intent. While it appears that proof of discriminatory intent may be required under 42 U.S.C. Sec. 1982, see General Building Contractors Association v. Pennsylvania, 458 U.S. 375, 383-91, 102 S.Ct. 3141, 3146-50, 73 L.Ed.2d 835 (1982), the Supreme Court has not yet reached the question. See City of Memphis v. Greene, 451 U.S. at 120, 101 S.Ct. at 1596. Neither have we found any authority binding on us that resolves the question. The district court apparently believed Greene to hold that evidence of specific intent was required to prevail under Sec. 1982. However, the court also found that the appellees' action in this case did not adversely affect any property interest within the reach of Sec. 1982, also relying on Greene. As we discuss infra, this finding correctly follows the law and provides the basis for our affirmance of the district court's judgment with respect to the Terrys' Sec. 1982 claim. We first address the Terrys' arguments with respect to discriminatory intent.
 
 
 55
 The Terrys argue that the court incorrectly required direct proof of discriminatory animus and assert that the "totality of the circumstances" reveals "factors highly probative of discriminatory intent." Appellants' Brief at 30. As the district court carefully considered circumstantial evidence presented by the Terrys to prove discriminatory intent in making its findings and never hinted, let alone stated, that it would take into account only direct evidence of intent, the Terrys have only wasted their limited briefing space arguing that we should consider all the evidence rather than explaining how the evidence supports their position. Examination of all the evidence presented at trial leaves us with the firm conviction that the district court's findings are not to be overturned.
 
 
 56
 The Terrys argue that many of the alleged violations of local law that occurred in connection with the construction of Roanoke Mills are probative of discriminatory intent. However, the district court found, and the evidence shows, that the Terrys benefitted from the very sorts of violations that they charge must have been motivated by discriminatory animus. They complain that Amoco Fabrics was not required to establish a buffer zone between Roanoke Mills and Hillcrest Community, yet the Terrys were not required to establish a buffer zone between the Terry Manufacturing Company plant and its residential neighbors. They complain that no building permit was obtained for Roanoke Mills, yet no building permit was ever issued for their plant. Most ironically, the Terrys filed suit against Amoco Fabrics for the very zoning violation of which the Terrys had been guilty just four days after receiving a unanimous City Council decision to rezone the Terrys' property to industrial use. Now they ask the courts to find that the City Council's decision to rezone the thirty-seven acres of Industrial Park for industrial use was somehow indicative of discriminatory intent. Obviously, evidence that laws are equally enforced (or not enforced) does not support a finding of discriminatory intent.
 
 
 57
 The Terrys argue that black community members were excluded from the decision making processes by the failure to consult with blacks and the holding of "secret" meetings. The record does not fully support these allegations. Nor did any failure to ensure black participation lead to a different result than would have obtained had more blacks been included.
 
 
 58
 With regard to black participation, we point out that a black school board member attended the very first meeting between Amoco Fabrics' representative Williams and Roanoke citizens. Williams met with Roy Terry on his second trip to Roanoke, in July of 1979. A black member of the City Council seconded the motion to reroute Industrial Boulevard. The Terrys were present at meetings during which the road closing, sale of Industrial Park to IDB, bond issuance and rezoning were discussed. The Terrys met with members of the Ad Hoc Committee to discuss the road rerouting and to propose an alternative route. There is no evidence that the Ad Hoc Committee's refusal to arrange a meeting between the Terrys and Amoco Fabrics' engineers was based on anything but their perception, which is supported by the record, that the Terrys' proposal for rerouting would be unacceptable and that such a meeting would threaten the anonymity of the industry.
 
 
 59
 We do not mean to overstate the extent of black participation. It does not appear that blacks were encouraged to participate; nor were the concerns and ideas of black community members solicited by those white men who took it upon themselves to oversee the recruiting of Amoco Fabrics. We simply point out that neither the Terrys, in particular, nor black persons, in general, were wholly excluded from the discussion surrounding the location of Roanoke Mills.
 
 
 60
 Nor does the record support the Terrys' claim that "secret" meetings demonstrated discriminatory intent or furthered racially discriminatory ends. The district court found that the IDB meetings were open to the public but not publicized. As such, they were held according to state law. There is no evidence that IDB meetings were usually publicized from which we might infer that there was something irregular about the meetings relating to Roanoke Mills. There is no evidence that the IDB members did or said anything at those meetings to suggest that they were acting for any purpose other than to encourage and facilitate Amoco Fabrics' location in Roanoke. The October 30, 1979, City Council meeting at which the rerouting of Industrial Boulevard was approved was announced on the radio. In short, the only evidence that the meetings were "secret" meetings is that the Terrys did not know they were to take place. This fact is not insignificant. The Terrys were obviously highly interested in the location of Roanoke Mills at the Industrial Park and naturally would have expected to be notified of relevant events. However, we cannot say that the mere fact that the Terrys were not notified of some meetings that were otherwise open according to law requires that we infer the existence of discriminatory intent.
 
 
 61
 Thus, we cannot say from the evidence on record that the "secrecy" of the meetings and the relative lack of black participation were themselves the result of discriminatory intent. Moreover, the record does not show that the decisions to locate Roanoke Mills next to Hillcrest Community and to reroute Industrial Boulevard were the result of any racial exclusiveness in the decision making process or of any discriminatory intent in general.
 
 
 62
 It is clear from the record evidence that Industrial Park was the only feasible site on which to construct Roanoke Mills. Its size, the proximity of the railroad, the availability of utilities and the City's ownership of the property made it the most attractive site from a business perspective. We reject as specious the Terrys' argument that the Ad Hoc Committee's failure to show the Phillips property to Williams is probative of discriminatory intent. At thirty-five acres, it was too small for Amoco Fabrics' purposes, and the acquisition of additional land would have added difficulty and expense, making the decision to reject it out-of-hand understandable. In general, there was testimony that the City appellees did not encourage Amoco Fabrics to select any particular site, casting doubt on the assertion Amoco Fabrics' choice resulted from an agreement to discriminate.
 
 
 63
 Several of the factors on which the Terrys place great weight are not probative of the question whether appellees' treatment of the Terrys was motivated by discriminatory animus. Amoco Fabrics' desire not to locate its plant in an area with a minority population greater than thirty-five percent of the total population is not relevant to its decision to build Roanoke Mills next to a black community. Amoco Fabrics' effort to ensure that its affirmative action efforts are "successful" does not tend to prove that Amoco makes any of its decisions out of discriminatory intent. Certainly we cannot infer from its commitment to hire blacks in proportion to their numbers in the community that Amoco Fabrics makes major business decisions primarily to harm blacks.
 
 
 64
 For the same reasons, Amoco Fabrics' labor survey proves nothing with respect to any decisions affecting the Terrys. Amoco Fabrics has offered a plausible neutral reason for sampling white males more heavily. Its race-consciousness in this regard does not prove anything with respect to the decision where to locate the plant.
 
 
 65
 We have not discussed every incident, "secret" commitment, failure to turn over a record and procedural irregularity alleged by the Terrys to be highly probative of discriminatory intent. We have, however, considered all the evidence and all of the Terrys' arguments with respect thereto, and we have discussed those most worthy of response. Taking into account the totality of the circumstances and the context in which this case arose, we hold that the district court's finding that the Terrys failed to prove discriminatory intent was not clearly erroneous. The court correctly entered judgment in favor of appellees with respect to the equal protection claim.
 
 
 66
 As we noted above, it is not clear whether the lack of discriminatory intent also disposes of the Terrys' Sec. 1982 claim. The district court's judgment with respect to that claim is due to be affirmed on the ground that the Terrys have failed to prove "any impairment to the kind of property interests that [the Supreme Court has] identified as being within the reach of Sec. 1982." Greene, 451 U.S. at 124, 101 S.Ct. at 1585. While discriminatory intent may be an element of a Thirteenth Amendment violation, see Greene, 451 U.S. at 126-128, 101 S.Ct. at 1599-1601; we also note that the reasoning supporting affirmance with respect to the Sec. 1982 claim similarly supports the holding that no "badge or incidence of slavery" is to be found in this case.
 
 
 67
 The district court found that Roanoke Mills is not a nuisance. The Terrys have not challenged this finding, and we would be hard pressed to find it clearly erroneous in light of the fact that the district court has viewed the site while we have not. Moreover, the jury in the state court proceedings determined that the Terrys suffered zero damages from the closing of Industrial Boulevard. As we shall explain shortly, we are bound by this finding of fact under principles of collateral estoppel. Thus, the Terrys' property rights have not been infringed. Nor is any inconvenience suffered by residents of Hillcrest Community "comparable to the odious practice the Thirteenth Amendment was designed to eradicate." Greene, 451 U.S. at 128, 101 S.Ct. at 1600. We must conclude, as did the district court, that disposition of the Terrys' Sec. 1982 and Thirteenth Amendment claims is directly controlled by City of Memphis v. Greene, which also involved a road closing. The district court's judgment in favor of appellees on these claims is therefore due to be affirmed.[4]
 
 B. Collateral Estoppel
 
 68
 The only error charged by the Terrys with respect to the collateral estoppel issue is the district court's failure to apply the "fairness" exception to the general rule of preclusion that obviously otherwise applies in this case. The Terrys appear to argue that the lack of due process at the probate court proceeding, stemming from the judge's alleged collusion with the City appellees, requires that they be allowed to present evidence that they were injured by the road rerouting. They completely neglect to mention that the circuit court proceeding on appeal from the defective probate court proceeding afforded them de novo consideration of the legality propriety of the road closing and a jury verdict on damages. It was the circuit court's determination with respect to the road closing issues that the district court held was entitled to preclusive effect in this action. As it appears that the issues of the legality (under Alabama law) of the road closing and the Terrys' damages therefrom were fully and fairly litigated in an Alabama state court, we hold that the district court correctly applied the principle of collateral estoppel to exclude evidence on those issues already necessarily determined adversely to the Terrys.
 
 
 69
 C. Intentional Interference with Business Relations (Cross-Appeal)
 
 
 70
 Under Alabama law, a prima facie case for the intentional interference with another's business is established by showing (1) an intentional act of interference and (2) some consequential harm to the plaintiff's business. Thompson v. Allstate Insurance Co., 476 F.2d 746, 748 (5th Cir.1973); Purcell Co. v. Spriggs Enterprises, Inc., 431 So.2d 515, 522 (Ala.1983). Justification for the interference is an affirmative defense. Thompson, 476 F.2d at 748.
 
 
 71
 The district court appeared to give two alternative reasons for denying the counterclaims. The first was that Amoco Fabrics and the IDB had not shown that the Terrys' intentional interference was wrongful. The parties agree that the court's discussion misstates the law insofar as it suggests that the plaintiff must prove wrongful purpose to make out a prima facie case. The district court's previous finding that the Terrys intentionally committed acts that interfered with the bond sale, thereby causing consequential harm to the counterclaimants, necessarily leads to the conclusion that Amoco Fabrics and IDB made out their prima facie case.
 
 
 72
 Thus, the only issue on cross-appeal is whether the district court's findings with respect to the second ground for denying the counterclaim--that the Terrys' interference was justified--are clearly erroneous. The court found that the Terrys contacted the California retirement systems--PERS and STRS--in an attempt to gather information they reasonably believed at the time was being withheld from them by the City. Amoco Fabrics and IDB point to several facts in the record that they maintain prove that the Terrys' alleged justification was pretextual and that the Terrys intended to coerce the counter-plaintiffs to settle with them. While this issue presents a close factual question, we cannot say that the district court was clearly erroneous in finding that the Terrys' interference with the bond sale was justified and not "wrongful" or "malicious." See James S. Kemper & Co. Southeast, Inc. v. Cox & Associates, Inc., 434 So.2d 1380, 1386 (Ala.1983).
 
 
 73
 The cross-appellants make much of the fact that the district court found that there were no documents in existence sought by the Terrys that were not turned over to the Terrys. A complete reading of the district court's opinion reveals that the court also found that the Terrys believed at the time that certain documents not actually in existence did exist and were being withheld. The court further indicated that this belief was justified. That the court could ascertain several years later that all requested materials had been given to the Terrys does not require us to conclude that it was error to find the Terrys' contemporaneous belief reasonable.
 
 
 74
 While the subject of the missing documents was not the sole topic in all of the Terrys' contacts with the parties to the bond deals, and while there is evidence to support the cross-appellants' interpretation of the Terrys' actions, it is undeniable that the Terrys sought documents from STRS and PERS that they were unable to obtain from the City. The determination of whether and when the Terrys actually requested documents from the systems turns largely on an assessment of the credibility of witnesses, which can best be made by the district court and is not easily overturned by this court. As our reading of the record does not leave us with the definite and firm conviction that a mistake has been made, we affirm the district court's judgment.
 
 D. Attorney's Fees
 
 75
 In Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978), the Supreme Court held that attorney's fees may be awarded in favor of a prevailing defendant under Title VII only where the court finds that the plaintiff's suit was "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." Id. at 422, 98 S.Ct. at 701. A finding of bad faith is not necessary to award fees to a defendant, but such a finding provides an even stronger basis for charging the plaintiff with attorney's fees. Id. Fees may not be awarded in favor of the defendant merely because the plaintiff ultimately lost. Id. at 421, 98 S.Ct. at 700. The Christiansburg principles were applied to attorney's fees awarded under 42 U.S.C. Sec. 1988 in Hughes v. Rowe, 449 U.S. 5, 14, 101 S.Ct. 173, 178, 66 L.Ed.2d 163 (1980).
 
 
 76
 Two equitable considerations underlie applying a more stringent standard to the award of fees to a prevailing defendant in the civil rights context. First, a plaintiff who loses has not been shown to have violated federal law, as has a losing defendant. More importantly for our purposes, awarding fees to prevailing defendants as a matter of course would "discourage all but the most airtight [civil rights] claims," thereby thwarting Congressional intent that plaintiffs serve as the "instruments" through which civil rights are vindicated. Christiansburg Garment Co., 434 U.S. at 418, 422, 98 S.Ct. at 699, 700. Thus, the Supreme Court has cautioned:
 
 
 77
 [I]t is important that a district court resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation ... Even when the law or facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.
 
 
 78
 Id. at 421-22, 98 S.Ct. at 700-01. The district court's decision to award attorney's fees on behalf of certain of the prevailing defendants in this case must be reviewed in light of these policies.
 
 
 79
 The district court gave various reasons for awarding fees in favor of the City, the Utility Board, the Industrial Development Board, Tommy Hill (former Mayor of Roanoke), Standard Oil and Amoco Chemicals. We will address the reasoning with respect to each defendant in turn.
 
 
 80
 The district court awarded attorney's fees in favor of the City, UB and IDB because it was "obvious" from the beginning of the suit that their liability was premised only upon a theory of respondeat superior, which is inapplicable in civil rights cases. Monell v. New York Dep't of Social Services, 436 U.S. 658, 691-92, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). The court did not explain its conclusion and we find it is unsupported by the record.
 
 
 81
 Throughout the proceedings in this lawsuit, the Terrys have contended that the UB, IDB and City Council took official action as entities in furtherance of a conspiracy to deprive the Terrys of their civil rights. They were alleged to have met in secret and to have taken illegal action with racially discriminatory purpose. This case does not involve allegations that these entities are liable solely because they employ tortfeasors.
 
 
 82
 Plainly, an entity can act only through the people who run it. As plainly, government bodies are persons who can be sued directly under 42 U.S.C. Sec. 1983. Monell, 436 U.S. at 690, 98 S.Ct. at 2035, 2036. It cannot be the case, then, that every allegation that members of a government body have violated Sec. 1983 states a cause of action only against the individual actors and not against the entity they represent.
 
 
 83
 The question is whether the actions of the IDB, UB and City Council members and of the Mayor Pro Tem amounted to official promulgations or executions of policy, practice or custom. Id. The recent Supreme Court decision in Pembaur v. City of Cincinnati, --- U.S. ----, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), makes clear that the wrongs alleged by the Terrys included wrongs committed by the governing bodies, as well as by employees thereof. In Pembaur, the Court stated:
 
 
 84
 No one has ever doubted ... that a municipality may be liable under Sec. 1983 for a single decision by its properly constituted legislative body--whether or not that body had taken similar action in the past or intended to do so in the future--because even a single decision by such a body unquestionably constitutes an act of official government policy.
 
 
 85
 Id. at ----, 106 S.Ct. at 1298. Moreover, the act of a single policymaker, such as Mayor Pro Tem Bonner, may represent the official policy if the decisionmaker possesses final authority to establish policy with respect to an action ordered. Id. at ----, 106 S.Ct. at 1299.
 
 
 86
 The City appellees argue that the UB "simply" received funds for the project and that the IDB "simply" voted to adopt the project, issue bonds and lease property. The Terrys alleged, however, that these and all other actions by employees and agencies of the City were motivated by discriminatory animus and were part of a scheme to harm the black community. They therefore alleged official policy as the basis for the liability of the UB, IDB and the City.
 
 
 87
 As the Terrys' charges included allegations of official policy in the nature of secret meetings and votes by the City Council, UB and IDB and of the issuance of secret commitments to Amoco Fabrics by Mayor Pro Tem Bonner, it is clear that the district court erred in concluding that the liability of the City, UB and IDB could find no basis in the law. As the liability of these defendants was fully tried, and the district court went to great length to explain their lack of liability (finding the Terrys' belief in a white conspiracy to have been reasonable in light of the facts available to them), we cannot affirm the court's order on the ground the Terrys' claims were otherwise frivolous, groundless or unreasonable. We therefore reverse the decision to award attorney's fees in favor of these defendants.
 
 
 88
 The district court found that the claims against Standard Oil and Amoco Chemicals were frivolous because there was no evidence of their participation in the alleged torts of Amoco Fabrics and because expressions of malice were contained in letters from the Terrys to Standard Oil.[5] The Terrys argue that they reasonably included the parent and grandparent of Amoco Fabrics under the "instrumentality" rule, based on their belief that the parent companies had "complete control" over the location of the plant by virtue of their right to approve any expenditure of funds for plant construction. In support of the instrumentality theory, they point to the fact that the parent and grandparent were consulted about the $200,000 road relocation deposit, approved the expenditure of $60 million to construct Roanoke Mills, and guaranteed the repayment of the IDB bonds, as well as to the fact that Standard Oil and Amoco Fabrics have common directors.
 
 
 89
 While it appears now that the instrumentality rule would have been unavailing as a ground for the liability of Standard Oil and Amoco Chemicals, the question for this court is not whether the Terrys' theory was without merit, but whether it was frivolous, groundless or unreasonable. We do not consider the relative dearth of evidence with respect to these defendants or the Terrys' aggressive attitude to be sufficient basis on which to assess attorney's fees against the Terrys.
 
 
 90
 The fact remains that there was evidence that both Standard Oil and Amoco Chemicals participated to some degree in the decision where to locate the fabrics plant. Had Amoco Fabrics in fact conspired with the City appellees to violate the Terrys' civil rights and had the parent and grandparent taken the limited actions they took with knowledge of Amoco Fabrics racial animus, the district court might well have found them to be co-conspirators. The Terrys' letters to Standard Oil are also insufficient ground on which to assess attorney's fees against a civil rights plaintiff. As the court itself observed, "malice may arise from righteous indignation as well as from frivolity." Record Excerpts, Tab M at 11.
 
 
 91
 The Terrys attempted to prove a conspiracy and, as they could prove little involvement on the part of Standard Oil and Amoco Chemicals, they lost a Rule 41(b) Motion to Dismiss. Neither company was required to go to further expense to defend against suit. We hold that the district court clearly erred in finding that the Terrys' introduced no evidence of Amoco Chemicals' and Standard Oil's participation and so abused its discretion in awarding attorney's fees in favor of these defendants.
 
 
 92
 Having reversed the awards thus far considered, we must affirm the district court's order with respect to Tommy Hill. The district court ordered the Terrys to pay these fees upon finding that the Terrys were well aware that Mayor Hill was too ill to participate in City business and that Mayor Pro Tem Bonner was administering the City during the relevant period. The Terrys' arguments on appeal are completely unresponsive to these findings. They merely assert that Mayor Hill failed to follow various Alabama laws without explaining how he could be charged with such failure when he was too ill to serve as mayor at the time. They do not deny the district court's finding that they were fully aware of Mayor Hill's incapacity and lack of participation in City affairs. We hold that the district court properly awarded attorney's fees in favor of Tommy Hill.
 
 E. Rule 54(d) Costs
 
 93
 The district court taxed costs against the Terrys with respect to the counterclaims. The Terrys object on the ground the counterclaimants did not prevail. They also object to the inclusion of costs incurred by the counterclaimants for computerized research and for certain depositions claimed by the Terrys to have been taken in connection with state court litigation.
 
 
 94
 Fed.R.Civ.P. 54(d) provides that "[c]osts shall be allowed as of course to the prevailing party unless the court otherwise directs...." In this case, the court "otherwise direct[ed]," so the Terrys' argument that the counterclaimants did not prevail is of no moment. The district court explained that the Terrys should bear the costs of the counterclaims because they would not have been filed in the absence the Terrys' lawsuit and because they were a reasonable effort to forestall the Terrys' continued harassment of the counterclaimants. Thus, while the court could not find that the counterclaimants should prevail on their allegations of unjustified interference, it concluded that the counterclaimants should recover their costs in successfully cutting short the Terry's aggressive tactics. We cannot say that the district court's decision in this regard constituted an abuse of discretion. See Gilchrist v. Bolger, 733 F.2d 1551, 1556-57 (11th Cir.1984) (indicating district court may deny prevailing party costs if it articulates some good reason for doing so).
 
 
 95
 With respect to the costs of computerized research, the Terrys argue that such research should be categorized as routine office overhead, as is the cost of typing. A panel of this court has already determined that reasonable costs of computerized research may be recoverable. See Johnson v. University College of University of Alabama in Birmingham, 706 F.2d 1205, 1209 (11th Cir.), cert. denied, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983).
 
 
 96
 Finally, the Terrys assert that the district court awarded $6,186.43 for depositions taken in connection with an action in state court. This fact is not evident from the face of the court's order. Moreover, the court expressly stated in its order of July 30, 1984, that it would not authorize the inclusion of the costs of those very depositions. Thus, it appears that the court did not intend that the Terrys reimburse the City appellees for the expenses associated with the taking of depositions for use in state court proceedings. On remand (necessary to re-calculate attorney's fees), any discrepancy between the district court's orders can be brought to its attention and corrected.
 
 IV. CONCLUSION
 
 97
 In summary, we have affirmed the judgment of the district court on the merits, affirmed in part and reversed in part the award of attorney's fees to the defendants and affirmed the assessment of costs against the Terrys on the counterclaims.
 
 
 98
 AFFIRMED in part; REVERSED in part and REMANDED.
 
 
 
 *
 Honorable James E. Doyle, Senior U.S. District Judge for the Western District of Wisconsin, sitting by designation
 
 
 [1]
 We do not have information about Amoco Fabrics' actual hiring practices at Roanoke Mills because the Terrys objected to the introduction of evidence on the subject at trial
 
 
 [2]
 The Terrys discovered that Roanoke Mills lacked such a permit when, beginning in December, 1980, they began contacting governmental agencies about Amoco Fabrics' project, apparently attempting to gather information and uncover legal violations. The Terrys contacted the Economic Development Administration, the Environmental Protection Agency, the Alabama Department of Public Health-Division of Solid and Hazardous Waste, the Alabama Water Improvement Commission and the Alabama Air Pollution Control Commission
 
 
 [3]
 42 U.S.C. Sec. 1982 provides as follows:
 All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold and convey real and personal property.
 
 
 [4]
 Having concluded that the district court's resolution of the merits of the Terrys' civil rights claims is due to be affirmed, we need not address the conspiracy issue, which requires proof of an overt act in furtherance of the illegal agreement
 
 
 [5]
 In particular, the court referred to a letter written by Roy Terry to the Chairman of the Board of Directors of Standard Oil on July 10, 1981, which stated in part:
 Other neutral parties such as California Retirement System (purchasers of your 160 million bond issue) have advised common sense entrapraneur-to-entrapraneur [sic] negotiations to resolve. Otherwise, legal entanglements and national notoriety will obviously last for years. If necessary, we and many allies are committed to legal fight forever.
 Defendant's Exhibit D-166.