Bruce LUCERO, M.D., and Jane Doe(s), being fictitious names, real names of said plaintiffs being withheld to protect their privacy, said fictitious names being intended to designate present and prospective patients and staff members of Dr. Lucero, Plaintiffs,

v.

OPERATION RESCUE OF BIRMINGHAM, Birmingham Rescue Mission, Randall Terry, Joseph Foreman, James Pinto, Leonard Gavin, John Michael Vice, Bill Stamp, Doug Scofield, Scott Houser and all other individuals, asso-

ciations and organizations whose names or legal identities are otherwise unknown to plaintiffs at this time, with whom they have conspired and acted in concert to deprive plaintiffs of their rights.   Defendants.

No.  CV91–PT–1082–S.

United States District Court, N.D.  Alabama, S.D.

Aug.  15, 1991.

David Elliott Hodges, Fliegel & Hodges, Birmingham, Ala., Alan M. Pollack, New York City, for plaintiffs.

J. Timothy Smith, Donald L. Collins, Thompson and Griffis, Michael J. Evans, Longshore Evans & Longshore, Kimberly R. West, Mark W. Lee, Parsons Lee & Juliano, Albert L. Jordan, Wallace Brooke & Byers, Timothy Scott Ritchie, Wallace Brooke & Byers, Birmingham, Ala., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PROPST, District Judge.

This cause is pending on plaintiffs' application for preliminary injunction.   The court has conducted an evidentiary hearing.[1]

The court will now attempt to bring some ordered legal consideration to an area

---

**1.** This court, prior to any evidentiary hearing, had prepared and filed an unpublished Prelimi- nary Memorandum Opinion to provide a basis for discussing the issues with the parties.

which is fully occupied by dialecticians and polemists; each having his or her own brand of contradictory certitude. The task is made considerably more difficult by the unsettled state of the law; particularly as it relates to the federal claims and the subject matter jurisdiction of the court.

The court starts with the inescapable conclusion that the evidence fully supports plaintiffs' position that they have been *legally* wronged. This court clearly does not have jurisdiction to determine if any of the plaintiffs, themselves, are guilty of some wrong at a divine level of behavioral assessment.

The determination that the plaintiffs have been legally wronged, however, is not the final answer. Before the court can reach the final answer, it must decide several interim issues. These are:

(1) Does this court have subject matter jurisdiction under a federal statute which provides for a preliminary injunction.[2]

(2) Is there sufficient evidence as to a particular defendant to allow for injunctive relief as to that defendant?

(3) Have the usual standard requirements for the granting of a preliminary injunction been met in this case at this juncture?

### Findings of Fact

Before the court wrestles with the difficult legal issues, it will find certain underlying facts so that any party may have the benefit of such findings in the event of an appeal. The court will restrict itself to essential facts rather than encumber the record with details.[3]

Plaintiff, Dr. Bruce Lucero (Lucero), is a physician licensed to practice medicine by the State of Alabama. Lucero specializes in the area of gynecology and provides his patients with general gynecological services including pregnancy and blood testing, prescriptions for birth control, family counseling, and abortions. Lucero sees approximately 3,000 patients per year and performs approximately 1,500 abortions per year. Lucero is suing on behalf of himself and his patients. One or more of his patients have also purportedly brought this action on their own behalf using the pseudonym of "Jane Doe." [4]

Lucero maintains his medical office (Clinic) at 1513 4th Avenue South, Birmingham, Alabama. Lucero's office is located on private property. Pursuant to the terms of this lease, Lucero has access to the office building occupied by him and the parking area which joins it. No defendant was invited or authorized by Lucero, any other tenant, the owners, or the management company which operates the property to come onto said premises. Lucero's practice consists of some patients who may come from states other than Alabama and also patients who reside in Alabama. Medical records introduced into evidence *suggest* that for a recent six month period of time, some one and one-half percent (1.5%) of Lucero's patients resided in states other than Alabama, and thus may have traveled across state lines to reach his office.

---

**2.** Plaintiffs acknowledge that RICO does not provide such a basis. The issue may or may not be a question of subject matter jurisdiction. It may be an issue of whether a claim has been stated pursuant to § 1985(3). There is no diversity jurisdiction.

**3.** While the court will consider the parties' suggested findings of fact, it has and will give individual consideration to each finding.

**4.** Although at least one of the defendants has suggested that no "Jane Doe" authorized this action on her behalf, the record reveals the following with respect to "Jane Doe–2":

Court's Question: I think the question is, did she authorize someone to represent her in this case.

Mr. Lee: Have you retained or authorized an attorney to bring a lawsuit on your behalf or do you know anything about bringing a law suit?
Answer: Yes.
Mr. Lee: As a Jane Doe?
Answer: Yes.
Mr. Lee: Who did you contact to represent you as a Jane Doe originally?
Answer: What happened is that I was contacted in reference to the case and when I spoke with Dr. Lucero, he told me who his lawyers were and I just contacted them.
Apparently "Jane Doe–1" was not questioned on the issue. If Lucero has standing to sue on behalf of his patients, the naming of the "Jane Does" may not be too meaningful.

There is no substantial evidence that any such patient has been interfered with by any defendant. There is a reasonable inference that patients who reside outside of Alabama have been referred to the Clinic by others outside Alabama. The fact that the Clinic performs abortions beyond the first trimester contributes to this fact.

Beginning in 1988, there have been several "rescues" at various medical offices which provide abortion services in the City of Birmingham. An organization or association known as "Operation Rescue" has been active in these "rescue" operations. The court will later address the involvement, if any, of individually named defendants in these "rescues." A rescue consists of a large number of people physically placing their bodies between the doors of facilities where abortions are performed and those seeking to gain entrance to the facility. As a result of rescues conducted at Birmingham area abortion facilities, patients and staff of various facilities have been denied entrance to the facility for substantial periods of time until the Birmingham police aid their entry.[5]

As the court has previously noted, portion of Lucero's patients may travel from states other than Alabama to his office. The individuals organizing the rescues in Birmingham, and those participating in the rescues were attempting to prevent women from exercising their constitutional and fundamental right to obtain an abortion. If on the day such rescues occurred, any woman from outside the State of Alabama had been seeking to enter Lucero's office for an abortion, she, as well as residents, would have been impeded in attaining access to the Clinic during the rescue period. The rescues would not have occurred but for the fact that women were seeking lawful abortion services. The activity challenged, therefore, is clearly directed at that class of women seeking to exercise their fundamental and constitutional right to obtain an abortion and those persons who would aid them in doing so. Two other facilities in Birmingham where abortions

are performed have been blockaded on several occasions in the past.

Defendant James Pinto (Pinto) was present at most, if not all, the various rallies and rescues and actively encouraged those present to participate in rescues as instructed. There is no question that Pinto was and is committed to preventing or impeding, on the occasions of rescues, the entry of those persons into the clinics who would seek abortions or provide abortion services. His ultimate objective, and that of Operation Rescue, would be to close all clinics to abortion activities. Pinto, along with Operation Rescue, has actively participated in disruptive and obstructive activities at Lucero's clinic and other such clinics. He has been arrested on more than one occasion for such activities. Pinto was represented but did not testify. Based on his past acts and statements, the court finds that defendant Pinto was a leader of the rescue movement and conspired to engage in such unlawful activities with others and will likely continue to engage in such conduct until the rescue objective is achieved.

Officer Rebecca Dill of the Birmingham Police Department testified, and the court finds, that defendant Leonard Gavin (Gavin) also participated in at least two of the Operation Rescue rallies she attended. Gavin has been arrested at Lucero's office on at least two occasions, the latest being March 2, 1991. At planning rallies, Gavin instructed the participants that during the course of the rescue, they were to follow the instructions of certain individuals designated as "crowd marshals." These marshals were to direct the rescuers as to when to begin the rescue, where to go during the rescue, and were to signal for a second group of rescuers to begin taking the places of those rescuers who were arrested by the Birmingham Police Department.

Operation Rescue, Gavin and Pinto actively led and participated in various activi-

---

5. "Substantial" is relative. The court means it to include periods other than temporary or momentary inconvenience. A constitutional right should not be deliberately and coercively denied for any period. There have been instances of delays for periods longer than 30 minutes.

ties which were designed to and did impede, for substantial periods, the entry of plaintiffs into the Clinic. There is no doubt about the activities of Gavin and Pinto being at the top level of Operation Rescue's activities. These activities include physically blocking entry to the Clinic and similar facilities. The evidence substantially supports a conclusion that Pinto, Gavin and Operation Rescue intend to continue such activities.

There is little question that defendant Doug Scofield (Scofield) is sympathetic with the activities of Pinto, Gavin and Operation Rescue. He, however, is an attorney who could have been legitimately present at various functions to give legal advice. While he did not testify, there is no evidence that he personally participated in or advised others to participate in any disruptive or obstructive activity. He did give advice with regard to potential arrests, etc. There was no evidence that Scofield was the attorney for any particular named client. The court cannot conclude that his being present and giving legal advice constitutes a violation of any right; certainly not one which should be enjoined at this stage.[6]

The evidence shows that defendant Bill Stamp (Stamp) was a pastor at Liberty Church (Church) where at least four Operation Rescue planning rallies were held starting in November 1988. Stamp spoke at these rallies and his Church was available to those involved in the rescue movement. Church served as the command post for Operation Rescue and as the mailing address for Birmingham Rescue Mission. Stamp was arrested during the course of one or more rescues. He has aided in the planning of the rescues.

Defendant Scott Houser (Houser) was present and spoke at every rally, except one, that officer Dill attended. He was arrested on several occasions at an abortion clinic other than Lucero's. He took a leadership role in the rallies and was looked upon by the participants as a leader.

Houser has been actively involved in Operation Rescue. He was represented but did not testify. There is some inference that he has at least partially discontinued his personal participation in rescues to devote time to political efforts in the same field. He has, in the past, taken a hard-line position against abortions and was in favor of rescues related thereto.

Defendant Michael Vice (Vice) was apparently not formally represented. It is likely that he will continue his disruptive activities. There is, however, no substantial evidence that he has conspired with anyone, attended rallies or participated in or led rescues.

There is also a reasonable inference that defendant Joseph Foreman has been present, in a leadership role, during at least two Operation Rescue rallies and has participated in disruptive activities at Lucero's clinic for which he has been arrested.

When this court speaks of "disruptive" and "obstructive" activity, the court has reference to the physically blocking of entry to the Clinic by protesters who lock arms, lie down, push, shove and perform other acts which impede reasonable entry to the Clinic. There is no question that the intent of the participants is to disrupt the effort of plaintiffs, and others similarly situated, to obtain and provide abortions; a constitutionally, protected private right which *Roe v. Wade* has clearly established. The disruptive activities are planned and scheduled so as to withhold information as to the object of the disruption to the last minute. The rescues are organized and are led by various people who make decisions and instruct on-the-scene. Included in the on-the-scene leaders have been Pinto, Gavin and, in the past, Houser. Rescues usually followed a rally.

Lucero's Clinic has been the object of at least five rescues; the latest on March 2, 1991. Pinto and Gavin significantly participated in the March 2 rescue and were arrested. Operation Rescue was involved. The March 2 rescue was significantly vio-

---

**6.** The court rejects plaintiffs' argument that Scofield had a duty, as an officer of the court, to directly advise the parties not to participate;

certainly not a duty which this court can enforce.

lent and resulted in some physical injuries of Clinic workers and police officers. The rescue traumatized and caused mental anguish to the Clinic's patients and workers. The activities of the rescue protesters were violent and intentionally went beyond protected peaceful First Amendment activity.[7]

The court finds that those persons who have participated in the Lucero rescue operations have conspired to do so; that in the course of the conspiracy they have gone onto the premises of Lucero's clinic; that they have done so for the purpose of depriving, directly and indirectly, a class of women who seek abortions of the constitutional right that they have to secure abortions;[8] that Operation Rescue, Pinto, Gavin and others have acted in furtherance of the object of the conspiracy whereby others have been injured in their person and property (the right to engage in a profession); and that others have been deprived of having and exercising a right or privilege of privacy of a citizen of the United States.

The court is not aware of any designated individual plaintiff in this action who is or was, at a pertinent time, a non-resident of Alabama.

There is no evidence of forbidden state action. Municipal law enforcement officers have acted admirably. The plaintiffs have not diligently pursued a state court action brought months before this one.

The only defendants who had apparently been served at the time of the hearing were Vice, Operation Rescue, Scofield, Houser, Stamp, Pinto and Terry.[9]

While there may be some circumstantial inference that non-residents of Alabama have been blocked or impeded by the defendants, there is no direct evidence of such and this court cannot find, at this stage, that any abortion patient has been so impeded or targeted. The records offered by the plaintiff in this regard are not trustworthy enough to form the basis for extraordinary preliminary relief.[10]

The fact that the rallies were conducted at a church, comments at the rallies and the rescues, and other evidence create a substantial inference that religious beliefs form a substantial basis for the rescue efforts. There is no evidence that the religious beliefs of any plaintiff were involved.

There is evidence that Lucero or his agents have engaged in counter-violence. This only emphasizes the volatile nature of the confrontations; particularly when there is disruption as opposed to peaceful pro-

---

7. Some of the defendants would seem to suggest that they were only exercising a First Amendment right to protest, inform and peacefully picket and that the plaintiffs were the problem. This court cannot accept an argument that "moving trees make the wind blow."

8. Interestingly, the proposed findings of Houser and Pinto include the following:

On March 2, 1991, between 15 and 19 persons blocked the doors of Lucero's facility. These persons were arrested by the Birmingham Police Department in approximately two hours. Two other facilities in Birmingham where abortions are performed have been blockaded on several occasions in the past.

\*     \*     \*     \*     \*     \*

At one Liberty Church meeting in November 1988, slides were shown of facilities in Birmingham where abortions were performed. Lucero's facility was displayed at that time. At the Liberty Church meetings attended by Dill, speeches were made about the need for an end to abortions in Birmingham. All the speakers dwelt on this theme, but the details of comments by particular speakers at the meetings are not clear. There was some dem-

onstration of the techniques of rescue at the meetings, including the desire expressed by the speakers to remain peaceful. The preponderance of the evidence was that these meetings were similar to a worship service or a revival.

After the worship service, persons who wished to participate in rescues divided into groups for planning for the next day.

Rescuers met again the next day early in the morning at Liberty Church for additional coordination and travel to the abortion facility chosen for the rescue. Dill testified that rescues are designed to exclude everyone from the clinic.

9. There was apparent service on an organization designated as Birmingham Rescue. The court can discern no difference between "Operation Rescue" and "Birmingham Rescue." There is no evidence as to Terry. Gavin may have been served at some point. The court does not know if he had notice of the hearing.

10. The court also cannot find that any efforts of any defendants were purposely and specifically directed toward any non-resident patients.

test. The court does not accept defendants' "clean hands" argument.

There is no evidence that Houser has ever appeared at a rescue at Lucero's Clinic. Houser's rescue activities seem to have been cut back if not discontinued. There is a likelihood that Pinto, Stamp,[11] Gavin, Operation Rescue and Birmingham Rescue will continue "rescue" activities if not enjoined.

The court further finds that, if this court has jurisdiction to consider the matter at this stage and that it is appropriate to do so under a federal statute, all of the requirements for preliminary injunction relief have been satisfied.

First, assuming jurisdiction (and availability of relief under a federal statute), there would be a substantial likelihood that plaintiffs would prevail on the merits as to defendants Pinto, Operation Rescue, Birmingham Rescue and Stamp.[12] There is substantial evidence that fundamental rights of privacy as espoused and enunciated in *Roe v. Wade* have been violated.

Second, the fact that fundamental constitutional rights have and will be violated and the trauma involved establish irreparable injury. *See N.E. Fla. Chapter v. J'vlle, Fla.*, 896 F.2d 1283 (11th Cir.1990).[13]

Third, the threatened injury to plaintiffs outweighs any harm that might result to the defendants.

Fourth, as suggested by Chief Judge Pointer in his opinion, attached hereto, the public would be served, not disserved, by the grant of a preliminary injunction.

### Conclusions of Law

■ The threshold issue which this court must address is whether it has jurisdiction or authority to grant injunctive relief pursuant to any federal statute. Plaintiffs acknowledge that the court cannot enjoin defendants under RICO. The only arguable basis for such injunction in this case is 42 U.S.C. § 1985(3).[14]

In *Collins v. Hardyman*, 341 U.S. 651, 71 S.Ct. 937, 95 L.Ed. 1253 (1951), the court addressed 42 U.S.C. § 1985(3)[15] which it described as having "long been dormant." Among the statements in that case are: "Such private discrimination is not inequality before the law unless there is some manipulation of the law or its agencies to give sanction or sanctuary for doing so. Plaintiffs' rights were certainly invaded, but neither their rights nor their equality of rights under the law have been, or were intended to be, denied or impaired." *Id.*, at 661, 71 S.Ct., at 942. The Court further stated that, "California courts are open to plaintiffs and its laws offer redress for their injury and their rights." *Id.*, at 662, 71 S.Ct., at 942. The court did, however, suggest that a "conspiracy by private individuals could be of such magnitude and effect as to work a deprivation of equal protection of the laws, or of equal privileges and immunities under laws." *Id.*, at 662, 71 S.Ct., at 942. While incidents of the type at issue here have become of significant magnitude, there is no evidence that they have been such as "to close all avenues of redress or vindication." *Id.*, at 662, 71 S.Ct., at 942. *Collins* had little, if any, discussion as to the type class intended to be protected by § 1985(3). The dissenters argued that the section did not require state action. Perhaps more interestingly, they stated that, "The source of the right in this case is *not* the Fourteenth

---

**11.** There is no evidence of Stamp's actual presence at Lucero's Clinic. There is evidence that he engaged in the planning sessions related to such rescues.

**12.** The court would presently so find only as to these defendants. Gavin was apparently not timely notified of the hearing.

**13.** The "right to travel" may or may not be such a fundamental right.

**14.** While the court may have pendent or supplemental jurisdiction which affords a basis for injunctive relief, the statement of a claim under RICO is far from clear. See note 4, Preliminary Memorandum Opinion, filed June 12, 1991. If there is no claim under § 1985(3), it would not seem appropriate to grant back door injunctive relief based on a claim pendent to a far from clear RICO claim which, itself, provides no basis for such relief.

**15.** Then 8 U.S.C. § 47(3).

Amendment." (Emphasis added). *Id.,* at 663, 71 S.Ct., at 943.[16]

The next significant consideration of § 1985(3) was in *Griffin v. Breckenridge,* 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). *Griffin* overruled, at least implicitly, any possible suggestion in *Collins* that state action or "manipulation of the law or its agencies" is required *in all instances.*[17] *Griffin* next engendered one of the problems which exists here when it stated, "The language requiring intent to deprive of *equal* privileges and immunities, means that there must be some racial, or *perhaps* otherwise class-based, invidiously discriminatory animus behind the conspirators' action. (Some emphasis in original). *Id.,* at 102, 91 S.Ct., at 1798. The Court did not decide whether racial bias was required. *Id.,* at 102 n. 9, 91 S.Ct., at 1798 n. 9. The Court added to the confusion by not only holding that the Thirteenth Amendment provided the source, in that case, to create "a statutory cause of action for Negro citizens .... ", but also that "[t]he right of interstate travel is constitutionally protected, does not necessarily rest on the Fourteenth Amendment and is assertable against private as well as governmental interference." *Id.,* at 105, 91 S.Ct., at 1800. Further, that, "That right [of travel], *like other rights of national citizenship,* is within the power of Congress to protect by appropriate legislation." *Id.,* at 106, 91 S.Ct., at 1800. (Emphasis added).[18]

After discussing allegations in the complaint with reference to the "right to interstate travel," the Court held that it was "[o]pen to the petitioners to prove at trial that they had been engaging in interstate travel or intended to do so, that their federal right to travel interstate *was one of the rights meant to be discriminatorily impaired by the conspiracy, that the conspirators intended to drive out-of-state civil rights workers from the state,* or that they *meant* to deter the petitioners from associating with such persons." (Emphasis added). *Id.,* at 106, 91 S.Ct., at 1801.[19]

Justice Harlan, in concurring, suggested that the Court's reliance on the "right of interstate travel" was unnecessary. It, however, opened the door for litigants and courts to grasp it as a premise in these type cases. *Griffin* does not make it plain whether its "class-based, invidiously discriminatory animus *behind* the conspirators' action" must be directed at *travelers* as a class, or whether the protected class could be some other class which had travelled, or whether protected class and travel are required in combination or whether the black citizens would have been protected without the travel, or whether all travelers are protected.

The next case which "clarified" the issues is *United Brotherhood of Carpenters and Joiners of America, etc. v. Scott,* 463 U.S. 825, 103 S.Ct. 3352, 77 L.Ed.2d 1049 (1983).[20]

---

**16.** The right involved in *Collins* was apparently one of association. The right of privacy recognized in *Roe v. Wade* may or may not find its source in the Fourteenth Amendment.

**17.** The majority in *Griffin* quotes with apparent approval a statement of the dissenters in *Collins* suggesting that Congress may pass laws supporting rights which exist *apart* from the Fourteenth Amendment. *Griffin,* at 95, 91 S.Ct., at 1794. *Griffin* rejected any suggestion in *Collins* that the Act might be unconstitutional. *Griffin* cannot stand for the premise that Acts of Congress which find their source in the Fourteenth Amendment do not require state involvement.

**18.** If the Court felt that the Fourteenth Amendment provided a source for the Act's application to private acts, it is strange that it invoked the Thirteenth Amendment and emphasized that the right to travel did not necessarily rest on the

Fourteenth Amendment. The Court must have been attempting to avoid the state action issue.

**19.** This court cannot find from the evidence in this case that there was any motive specifically *directed* at out-of-state travelers or any specific intent to drive them out of the state or any animus directed at such travelers, if any, because they were travelers.

**20.** *Great American Fed. S. & L. Ass'n v. Novotny,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979) does not add much food for thought to the present discussion. It was primarily decided on the basis that to allow a § 1985(3) claim to be based on a Title VII violation would interfere with the detailed requirements of Title VII. It may be the first case to state, in apparent dictum, that § 1985(3) does not create a substantive right.

The significant holdings in *Scott* were the following:

(1) An alleged conspiracy to infringe First Amendment rights is not a violation of § 1985(3) unless it is proved that the State is involved in the conspiracy or that the aim of the conspiracy is to influence the activity of the State. *Id.*, at 831, 103 S.Ct., at 3357.

(2) That, as held in *Griffin*, "rights protected by the Thirteenth Amendment *and* the right to travel guaranteed by the *Federal Constitution* are protected from interference by purely private conspiracies." (*Emphasis added*). *Id.*, at 832–33, 103 S.Ct., at 3358–59.[21]

(3) A conspiracy aimed at a right that is by *definition* a right only against state interference requires state action under § 1985(3). *Id.*, at 833, 103 S.Ct., at 3358.[22]

(4) *§ 1985(3) provides no substantive rights itself to the class.* Id., at 833, 103 S.Ct., at 3358.

(5) The Court did not "affirm" the lower court holding that § 1985(3) reaches conspiracies other than those motivated by racial bias and "disagreed" with the lower court holding that it forbids conspiracies against workers who refuse to join a union. *Id.*, at 835, 103 S.Ct., at 3359. The Court said it was a "close question" as to whether the section was intended to protect anyone other than "Negroes and those who championed their cause." *Id.*, at 836, 103 S.Ct., at 3360. The Court withheld judgment on the question. *Id.*, at 837, 103 S.Ct., at 3360.

(6) The Court's ultimate conclusion was that § 1985(3) does not reach conspiracies motivated by economic or commercial animus. *Id.*, at 838, 103 S.Ct., at 3361.

Neither the lower court in *Scott* nor the Supreme Court determined whether § 1985(3) reaches conspiracies to deprive classes of rights, privileges, or immunities under state law or those "protected against private action by the Federal Constitution or federal statutory law." *Id.*, at 833–34, 103 S.Ct., at 3358–59. The Supreme Court dissenters argued that the section should have a much broader coverage than that allowed by the majority.

*Griffin* answered only one question. It, in substance, said, "Black citizens, and perhaps those acting in concert with them, who are travelling interstate are protected by § 1985(3)."[23] *Scott* clearly held that economic and commercial classes are not covered. The Court has opened the door to questions which have still not been clearly answered. Among the unanswered questions, pertinent to this case, are:

(1) Does § 1985(3) apply to any case in which there is no alleged racial bias?

(2) Does § 1985(3) apply to interstate travelers as a class regardless of race or other class category?

(3) Does § 1985(3) protect, regardless of travel, and without state action, "perhaps" other classes of persons?

Some courts, particularly those of the Fifth Circuit, have flatly stated that "[i]t is well established in this circuit that the only conspiracies actionable under Section 1985(3) are those motivated by racial ani-

**21.** No explanation is given as to what provisions of the "Federal Constitution" are referenced as guaranteeing the right to travel.

**22.** Apparently the First Amendment is by "definition" a right protected only against state interference. Apparently, rights relating to race and/or travel are not so by "definition." The question arises as to whether the constitutional right to privacy recognized in *Roe v. Wade,* is by "definition" a right protected only against state interference. In a concurring opinion, Justice Stevens stated that purely private acts of discrimination against women do not violate the Fourteenth Amendment. *Id.,* at 384–85, 99 S.Ct., at 2355–56.

Prior to being named to the Supreme Court, Justice Stevens opined that claims under § 1985(3) premised on the Fourteenth Amendment require state involvement. *Dombrowski v. Dowling,* 459 F.2d 190 (7th Cir.1972). Justice Stevens similarly opined in *Cohen v. Illinois Institute of Technology,* 524 F.2d 818, 828–29 (7th Cir.1975). He noted that his conclusion was contrary to some holdings that state action is never necessary in a § 1985(3) action. *Id.,* note 31.

**23.** And likely black persons or those acting in concert with them even if not travelling. It is not so clear whether the section would apply to a group of out of state travelers, in the absence of racial bias.

mus." *Deubert v. Gulf Federal Sav. Bank,* 820 F.2d 754, 757 (5th Cir.1987) and cases cited therein. This statement was also made in *Rayborn v. Miss.State Bd. of Dental Examiners,* 776 F.2d 530, 532 (5th Cir.1985) by such eminent legal scholars as Chief Judge Clark and Judges Brown and Gee. The sole authority they cite for this proposition is *United Brotherhood of Carpenters and Joiners v. Scott, supra.*[24]

Other courts have not so restricted the application of § 1985(3). This court will not attempt to analyze the holdings of all other courts, but a number of them have apparently extended the scope of § 1985(3) beyond racial bias claims.[25]

Some circuit court cases have specifically addressed rights of those seeking abortion. The two circuit court cases primarily relied upon by the plaintiff are *New York State Nation Org. for Women v. Terry,* 886 F.2d 1339 (2d Cir.1989) and *Now v. Operation Rescue,* 914 F.2d 582 (4th Cir.1990).

*Terry* held *inter alia,* that:

(1) Health care providers have standing to bring actions, such as this instant action, on their own behalf and to assert the rights of their patients. *Id.,* at 1348.[26]

(2) That the First Amendment does not protect protesters who assault or harass or invade another's personal space. Further that demonstrators (such as those in this instant case) who attempt to block ingress to plaintiffs' clinics are trespassers without right to be there. *Id.,* at 1343 and 1362–64.[27] See also other cases cited therein.

(3) That § 1985(3) encompasses conspiracies against women and others as a class and not just blacks. *Id.,* at 1359. See also other cases cited therein.[28]

(4) That a conspiracy focused on women seeking abortions reveals an attitude or animus based on gender, not just an activity or "subgroup" of women. *Id.,* at 1359–60.

(The court next addressed the question of "whether this conspiracy deprived plaintiffs ... of any constitutional right. The rights considered were the right to travel and the right to obtain abortions).

(5) With slight discussion of the evidence, the court held that the plaintiffs were entitled to summary judgment on their claim of right to travel deprivation. *Id.,* at 1360–61.[29]

(6) The court did not reach the deprivation of right to abortion claim. *Id.,* at 1361.

(7) The court also held that summary judgment on the trespass claim was appropriate and that a preliminary injunction was properly issued. *Id.,* at 1361–62.

In *NOW v. Operation Rescue, supra,* the district court had granted relief based upon a conclusion that "[t]he defendants' activities operated to deny to women seeking abortion and abortion-related services the right to travel interstate in search of medical services...." *Id.,* 914 F.2d at 584.[30] The district court further found, as does this court, that defendants' activities had "crossed the line from persuasion into coercion and operated to deny the exercise of rights protected by law." The Fourth

---

**24.** Chief Judge Clark wrote the lower court opinion which was reversed in *Scott.*

**25.** Some cases have involved Indians and other possible racial classes. An example of an extreme application of class determination after *Griffin* is *Azar v. Conley,* 456 F.2d 1382, 1386–87, n. 5 (6th Cir.1972) where the court suggests that a "middle class white family" might be considered a protected class under § 1985(3).

**26.** This court agrees as to a "right to abortion" claim. *See also Deerfield Medical Center v. City of Deerfield Beach,* 661 F.2d 328 (5th Cir. Unit B 1981). There may, however, be more of a question as to whether Lucero has standing to bring a "right to travel" action. *See Construction In-*

*dus. Ass'n v. City of Petaluma,* 522 F.2d 897, 904 (9th Cir.1975) and *Linmark Assoc., Inc. v. Township of Willingboro,* 535 F.2d 786, 794 (3rd Cir. 1976). There is no evidence that either Jane Doe plaintiff travelled interstate.

**27.** This court agrees with both premises.

**28.** The court stated the class to be "women seeking medical and abortion-related services." *Id.,* at 1358.

**29.** As discussed elsewhere, the Second Circuit does not limit right to travel claims to interstate travel.

**30.** It is not clear whether the court required both a protected class and travel.

Circuit affirmed a holding that "gender-based" animus satisfies the "purpose" element of § 1985(3). *Id.*, at 585. Further, citing only *Terry*, the court held that blocking access to medical services provided by abortion facilities which *serve* an interstate clientele violates the constitutional right to travel. *Id.*, at 585. The court did not discuss whether without the right to travel element, the district court would have had jurisdiction.[31]

The Fifth Circuit had a similar issue before it in *Roe v. Abortion Abolition Soc.*, 811 F.2d 931 (5th Cir.1987).[32] The court did not reach the issue of whether § 1985(3) "[p]rohibits religious discrimination because, even assuming that it does, the plaintiffs have not stated a claim of discrimination against a class of persons because of their religion." *Id.*, at 934.[33] This *Roe* case adds some confusion to this court's consideration of the issue. After disavowing a consideration of religious discrimination, the opinion proceeds to discuss religious belief. The court ultimately affirmed the dismissal of the § 1985(3) claim even though the complaint alleged that "[m]embers of the society had threatened, harassed, intimidated, and assaulted them while they were seeking family planning or abortion services." *Id.*, at 932. Interestingly, the court does not cite the Fifth Circuit cases which hold that § 1985(3) protects only against racial bias. The court affirmed the dismissal although it assumed, "[f]or present purposes, without deciding, that the 'right to equal exercise of the right to choose' an abortion is protected by § 1985(3)." *Id.*, at 934. The court's subsequent discussion on what can be construed to allege a class-based animus has

not been significantly grasped by this court.[34] The court does note that Judge Rubin equates "animus" with "prejudice." *Id.*, at 934.

In *Mississippi Women's Medical Clinic v. McMillan,* 866 F.2d 788 (5th Cir.1989), the plaintiffs claimed that they were a class of "women of childbearing age who seek medical attention from MWMC." *Id.*, at 794. The court stated:

Assuming *arguendo* that this grouping constitutes a class, MWMC still has not shown that the protestors acted with an invidious discriminatory *animus* against that particular class. Rather, the record indicates that the protestors do not target their pro-life advocacy at any particular group. The protestors (who are made up of both men and women) confront and try to persuade to their point of view all groups—men, women of all ages, doctors, nurses, staff, the female security guards, etc. In fact, MWMC's introduction to William Conlee's letter written to a male doctor indicates that the animus of the protestors is to dissuade *anyone* who contributes to the incidence of abortions. It is useful to reiterate that the legislative history indicates that Congress wanted to evaluate "class-based invidious discrimination" through the lens of "animus or motivation," not impact. *See United Brotherhood of Carpenters Local 610,* 463 U.S. at 834–35, 103 S.Ct. at 3359. Thus, if the plaintiffs in *Abortion Abolition Society* identified themselves as a class that was so over-inclusive as to be meaningless, MWMC in this case has designated a class that is so under-inclusive as to mischaracterize the dispute.

**31.** The Fourth Circuit holding may be inconsistent with its holding in *Harrison v. KVAT Food Mgt., Inc.,* 766 F.2d 155 (4th Cir.1985).

**32.** Two municipalities were also named as defendants, but they were named pursuant to 42 U.S.C. § 1983. It does not appear that their joinder involved the § 1985(3) claim against private parties. There is a suggestion in the case that if a state or state entities do not protect persons such as the plaintiffs here, those persons may have a claim under 42 U.S.C. § 1983.

**33.** Neither have these plaintiffs. While the defendants' religious zeal may affect their actions, there is no proof that their activities were directed toward plaintiffs' *religion*.

**34.** Apparently the court simply held that a class defined as "those people who do not agree with the defendants' point of view" is not a class protected by § 1985(3). In any event, other than the suggestion that § 1985(3) classes should be defined based on the characteristics of the plaintiffs rather than the beliefs of the defendants, this court finds no aid in this case.

(*Emphasis in original*). *Id.*, at 794.

The court does not say what the situation would be if the class had been stated as broadly as were those targeted by the protesters. The case is distinguishable from that here in that the court noted that "[w]omen are receiving abortions and no one is being restrained." *Id.*, at 794. The court also generally held that the defendants had not gone beyond their First Amendment privileges. Judge Wisdom would have "recognize[d] as a protected class *women seeking medical aid from the clinic.*" *Id.*, at 797. No mention is made of the Fifth Circuit cases which require a racially based class.[35]

The court next seeks some guidance from Eleventh Circuit cases. It starts with the apparent dictum in *Faucher v. Rodziewicz*, 891 F.2d 864, 871 n. 4 (11th Cir. 1990) where the court said:

> We note parenthetically that in *Great American S & L Ass'n v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), the Supreme Court appeared to hold that the only conspiracies actionable under Section 1985 were those motivated by racial animus. There, the Court stated that "[u]nimpaired effectiveness can be given to the plan put together by Congress in Title VII only by holding that deprivation of a right created by Title VII cannot be the basis for a cause of action under § 1985(3)." *Novotny*, 442 U.S. at 378, 99 S.Ct. at 2352.
> Since *Novotny* arose in the context of *private* employment, however, we will not flatly conclude that Dr. Faucher may not bring her claim for gender-based discrimination under the auspices of Section 1985(3). We save that question for another day.

(Emphasis in original).

In *Terry Properties, Inc. v. Standard Oil Co. (Ind.)*, 799 F.2d 1523, 1533–34 (11th Cir.1986), the court said:

> The corporate appellees, as private actors, may be liable for infringement of Fourteenth Amendment rights only

through conspiracy with state actors in violation of 42 U.S.C. § 1985(3).

*Id.*, at 1534.

Other than these general type observations, this court has not found, and has not had cited to it, any Eleventh Circuit cases which could be considered controlling, or even persuasive, here. *Arnold v. Board of Educ.*, 880 F.2d 305 (11th Cir.1989) involved an abortion type privacy issue, but the plaintiffs were black and the § 1985(3) class was based on race.

Perhaps the best focus on the issue is found in *Lewis v. Pearson Foundation*, 908 F.2d 318 (8th Cir.1990) which was vacated and then annulled by a divided *en banc panel* without discussion at 917 F.2d 1077.

■ Having likely created more heat than light, the court will now attempt to solve this Chinese puzzle. The court's ultimate conclusion is that, in order to establish a claim under § 1985(3), the plaintiffs must allege and prove:

(1) A conspiracy which is

(2) for the purpose of depriving either directly or indirectly, any person or class of persons of the equal protection of the laws or of equal privileges and immunities under the laws;

(3) that one or more of the conspirators did an act in furtherance of the conspiracy whereby another was injured in his person or property or was deprived of having and exercising any right or privilege of a citizen of the United States. *Griffin, supra,* at 403 U.S. at 102–03, 91 S.Ct., at 1798–99; and

(4) that the right or privilege deprived or sought to be deprived is either one which is by "definition" one that does not require state action (*Scott, supra*, 463 U.S., at 833, 103 S.Ct., at 3358), or that there be evidence of state involvement or, at least, some effort on the part of the conspirators to thwart equal protection by the *state*. The last requirement, established by *Scott*, is an element which this court cannot find

---

**35.** In *Wong v. Stripling*, 881 F.2d 200, 202–03 (5th Cir.1989), decided after both *Roe v. Abortion Abolition Soc., supra,* and *McMillan, supra,*

Chief Judge Clark lists, as an essential element of a § 1985(3) claim that "[t]he action of the conspirators is motivated by racial bias."

in this case. This court cannot conclude that, whereas a right or privilege as substantive and fundamental as a First Amendment right is constitutionally protected only against state interference, a non-explicit constitutional right of privacy is otherwise. *Cf. NE Fla. Chapter v. J'ville, Fla., supra.*[36] The "state" element not being present, plaintiffs cannot prevail at this stage on a "right to abortion claim" pursuant to § 1985(3).[37]

■ Neither can the court conclude that plaintiffs have met their burden of proof under a "right to travel" claim (assuming that there can be such an independent claim). As stated in *Scott v. Moore,* 680 F.2d 979, 997 (5th Cir.1982): [38]

> Neither can it be supported by the right to travel on the present record. Although the plaintiffs alleged that the object of the defendants' conspiracy was to deprive them of the right to interstate travel, they have introduced no evidence to show that either the purpose or the result of the conspirators' acts was to infringe upon their right to such travel.[39]

*Terry* may be partly explained because the Second Circuit has held that the Constitution protects the right to travel freely *within* a single state. *King v. New Rochelle*

---

36. At one point in *Roe v. Wade,* 410 U.S. 113, 164, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973), the Court bases its decision on a conclusion that the Texas statute violated the Fourteenth Amendment. This makes the state action requirement even more apparent. *Cf. Rodriguez–Garcia v. Davila,* 904 F.2d 90, 99 (1st Cir.1990) and *Wong v. Stripling,* 881 F.2d 200, 203 (5th Cir.1989).

While commentators have criticized *Scott* and have said it emasculates § 1985(3), this court cannot ignore it. For example, *See Rethinking Novotny,* 27 How.L.J. at 1513, which states that characterization of § 1985(3) as remedial is:

> ... without question the greatest limitation that the court has placed on the statute. Requiring plaintiffs to invoke some independent right whose denial section 1985(3) is supposed to remedy practically emasculates the provision since most federal statutory rights have their own exclusive administrative and judicial remedies and very few constitutional provisions apply against private persons.

This court has no authority to "correct" The Supreme Court. This court recognizes that an argument can be made that the free floating constitutional source for the right of privacy arguably makes it more analogous to the right to travel than to the First Amendment. While just about anything can and has been argued, and sometimes accepted, in this area, this court cannot square with logic that something so fundamental as the First Amendment privileges of speech and association are protected only against state interference, but that a hazy right of privacy is more broadly protected. Question: If two or more people conspire to be "Peeping Toms", would § 1985(3) be implicated, if the right of privacy does not require state involvement?

One of the concerns expressed in *Griffin* and *Scott* has been the possibility that § 1985(3) could create a body of federal tort law. If the Constitutional "right of privacy" is, by "definition" one which is subject to protection against private action, the federal tort area could be considerably expanded. *Cf. Siegert v. Gilley, ——*

U.S. ——, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) and cases cited therein.

37. The court will not decide, at this stage, whether there is satisfaction of the element of a "perhaps" otherwise class-based invidiously discriminatory animus behind the conspirators' actions. The court cannot find, of course, that there is any animus directed at women as a group. Neither can the court find that there is an animus directed at pregnant women. Many women have joined with the defendants. Men who participate in the abortion procedure are also targets. The animus is directed at the practice of abortion and the concept that its practice is legal. There may be no animus toward the *characteristics* of a class. The animus is against the principle that it is morally and legally right to abort a fetus. Of course, those who think and act to the contrary become the object of the acts which would deprive them of their legal rights and some pregnant women become the real victims. *Cf.* Judge Rubin's discussion in *Roe v. Abortion Abolition Soc.,* 811 F.2d 931, 935 (5th Cir.1987). Judge Rubin refers to a "despised trait." He also quotes Supreme Court language to the effect that "Moreover, the class must exist independently of the defendants' actions...." Can it be said that pregnant women who seek abortions and/or those who provide them have a "despised trait" or that they exist as a class, independently of the defendants' actions?

38. This court has not here included an analysis of *Scott v. Moore* (the Fifth Circuit case which led to *Scott, supra* ), but much of what is said there by both the majority and the dissenters supports the conclusion here. Presumably, some portions of that decision are still controlling here.

39. As suggested above, there is no substantial evidence in this case that the rights of any traveler have been interfered with or that any animus or motive was directed at travelers as such.

*Municipal Housing Authority,* 442 F.2d 646 (1971), *cert. denied,* 404 U.S. 863, 92 S.Ct. 113, 30 L.Ed.2d 107 (1971).[40] If the right applies to intrastate travel *and* it is not necessary that the motive of the conspirators be directed against the *travelers* as such, and/or if no invidiously discriminatory animus other than against travelers is required, § 1985(3) could reach about any tort where any travel and a conspiracy are involved.

*Spencer v. Casavilla,* 903 F.2d 171, 175 (2d Cir.1990) suggests that the right to travel element must be combined with some other class-based, invidiously discriminatory animus such as race.[41] In *Roe v. Abortion Abolition Soc., supra,* Judge Rubin seems to suggest that the "right to travel" unconnected to a protected class does not provide an independent basis for relief under § 1985(3). He stated,

> Because plaintiffs do not form a class protected by § 1985(3), it is unnecessary for us to consider whether the allegation that the defendants' acts were intended to deprive some citizens of the right to travel interstate sufficed to state the kind of federal constitutional right protected by § 1985(3), or whether, as contended by the defendants, it was inadequate because "not aimed at transients."

If "right to travel" is an offshoot of equal protection, it is difficult to see why it, too, does not find its source in the Fourteenth Amendment. In Wildenthal, *State Parochialism, etc.,* 41, Stan.Law Review 1557, 1574, the author states:

> The right-to-travel strand of equal protection is an unusual hybrid, standing somewhere between the voting rights cases and the classic race discrimination cases. Right-to-travel analysis typically scrutinizes classifications based on how recently an individual has traveled into a state. Thus, as in classic suspect classification analysis, the object of scrutiny is the basis of classification, not the benefit (such as voting rights) denied. But the basis of classification is not an immutable or obvious personal characteristic such as race or gender, but the exercise of a "right". It is here that the right-to-travel analysis begins to share the key problems faced in *Ramirez:* namely the uncertain dimensions and origin of the substantive right at issue.

If a right is guaranteed in the Constitution, it would seem to be clearly legitimate to regard it as "fundamental" for equal protection purposes.... The troubling temptation of the fundamental rights strand of equal protection is simply to invent new "fundamental rights", and then to protect them by subjecting to strict scrutiny any classification scheme affecting them. Regardless of whether the exercise of the claimed right is itself the basis of classification, or is denied or hindered as a result of a clarification scheme, the problem remains the same: Where does the right come from?

Because this court has neither found state involvement nor sufficient evidence to support a "right to travel" claim, the court cannot grant plaintiffs' application for preliminary injunction. There may be other reasons for such a denial. Some courts have suggested that preliminary injunctions should not be granted when there is a factual conflict or difficult questions of law. Others have suggested that such an approach is unacceptable as a general rule. See Wright & Miller, Federal Practice and Procedure: Civil § 2948, notes 66 and 67. While here, the applicable law is certainly unresolved, the court will not use that as a basis for denying a preliminary injunction. The substantial issue of fact, or mixed issue of law and fact, with reference to the right to travel issue is a basis for denying the injunction.

Another reason for this court's ultimate conclusion, is that Chief Judge Pointer of this court has already considered the issues and has reached conclusions contrary to those argued for by the plaintiffs. It has been the practice of this court for judges to

**40.** Also in *Spencer, infra.*

**41.** For some reason the court elected to find the black plaintiff's constitutional right to be premised on the right to travel rather than the Thirteenth Amendment.

follow the opinions of other judges of this district, in the absence of clear, controlling law to the contrary. There is no such clear law to the contrary.

While this court may have authority to grant the requested injunction based on pendent or supplemental jurisdiction, that type jurisdiction involves a doctrine of discretion, not of right. *Laird v. Bd. of Trustees of Inst. of Higher Learn.*, 721 F.2d 529, 534 (5th Cir.1983, Goldberg, Judge). While the federal claims may not be insubstantial, there are significant questions concerning their application here. This, coupled with the fact that one or more of the plaintiffs have deliberately failed to follow up requests for injunctive relief in older state case(s), requires this court to apply its discretion so as to not grant extraordinary relief premised solely on state claims. As stated by Judge Goldberg,

> To urge decision on state issues when a dubious federal claim provides the only basis for federal jurisdiction amounts to an argument that "the state tail should wag the federal dog." *Mayor of the City of Philadelphia v. Educational Equality League*, 415 U.S. 605, 627 n. 23, 94 S.Ct. 1323, 1337 n. 23, 39 L.Ed.2d 630 (1974).

*Id.*, at 534.

Some may think that the mere fact that *Roe v. Wade* was decided by the Supreme Court and defines a constitutional right, provides this court with jurisdiction. The same argument could be made with regard to the First Amendment and due process. Nevertheless, these latter two constitutional rights are not protected when there is no state involvement. If private parties conspired to deprive adult bookstores of a First Amendment right to do business, there would be no right to a claim under § 1985(3) in the absence of state involvement.

---

**42.** The court does not decide the "class" issue.

**43.** As noted earlier, absence of jurisdiction may equate with failure to state a claim upon which relief may be granted. Some appellate courts

*Summary*

The court ultimately concludes that:

(1) Plaintiffs cannot prevail at this stage on their "right to abortion" claim because of the absence of state involvement.[42]

(2) Plaintiffs cannot prevail on their right to travel claim because they have not carried their evidentiary burden of proof with regard to said claim.

(3) It would be inappropriate to grant a preliminary injunction based on supplemental jurisdiction as to state claims when the basis for federal jurisdiction, if any, is weak.

In view of this court's feeling that plaintiffs have been wronged and that they are likely entitled to some remedy in some court, there could be a temptation to assume jurisdiction where there is none.[43] In this day of increasing effort to cut back on diversity jurisdiction, with one of the reasons given being the increased quality of the state judiciary, it would be a sign of judicial arrogance, however, to suggest that the same state judiciary will not address constitutional wrongs as to which federal courts do not have jurisdiction.

---

have so determined. Clearly this court has jurisdiction to entertain a properly stated claim under § 1985(3).